Charles JONES et al., Plaintiffs,

v.

Sol J. WITTENBURG et al., Defendants.

No. CA–C70–388.

United States District Court,
N. D. Ohio, W. D.

Dec. 18, 1980.

See also, D.C., 440 F.Supp. 60.

Advocates for Basic Legal Equality, Tole-do, Ohio, for plaintiffs.

John G. Mattimoe, Richard M. Kerger, Toledo, Ohio, for defendant Sheriff.

John F. Hayward, Toledo, Ohio, for defendants County Commissioners.

## MEMORANDUM AND ORDER

DON J. YOUNG, Senior District Judge.

This cause came to be heard upon the Fourth Report of the Special Master evaluating the state of compliance of the Defendants with the Court's Orders of July 30th, 1971, as modified, and July 29th, 1977. Said Fourth Report is attached hereto as an appendix, incorporated herein by reference, and made a part hereof as fully for all intents and purposes as if set forth at length herein.

Both the Plaintiffs and the Defendant Sheriff have filed objections to the report of the Special Master. No objections have been filed by the Defendant Commissioners. The Sheriff has requested a hearing on his objections before any ruling of the Court.

The Court, however, has reviewed the report of the Special Master with great care and has considered the objections of the parties in light of the report and finds them to be without merit. The Court will, therefore, overrule all objections to the Fourth Report of the Special Master and confirm said report in all respects. In confirming said report, the Court adopts the findings with respect to the state of compliance in all aspects of the case. The Court further will adopt the recommendation of the Special Master that the rules for the regulation of the Lucas County Correction Center, which have been adopted by the Lucas County Court of Common Pleas, be substituted for and replace the Court's original Order of July 30th, 1971, as amended.

Finally, the Court will grant to the Defendants sixty (60) days in which to effectuate full compliance with those areas wherein the Special Master found noncompliance. These include rules 6B 1–5; 6C; 10; 11; 12C; 14D; 15E; 15G; 15I; 23B; 23F; 24B; 24D; 24F; 29B; and 29C. Within this time, the Defendants must make whatever physical repairs and alterations, including repair of plumbing fixtures, painting of showers and installation of laundry facilities, which are required to effectuate full compliance. The Court will require the Special Master to report on the state of compliance with respect to the above referred to rules within ninety (90) days from the date of this Memorandum and Order.

THEREFORE, for the reasons stated herein, and for the cause of appearing, it is

ORDERED that the objections of the parties to the Fourth Report of the Special Master should be, and they hereby are overruled in their entirety, and it is

FURTHER ORDERED that the Fourth Report of the Special Master is confirmed in all respects, and it is

FURTHER ORDERED that the rules for the regulation of the Lucas County Correction Center, adopted by the Lucas Court of Common Pleas, should be, and they hereby are, substituted for and replace the Court's Order of July 30th, 1971, as modified by subsequent Orders of the Court; and it is

FURTHER ORDERED that all Defendants, as well as their subordinates, proceed at once to effectuate full compliance with the rules for the regulation of the Lucas County Correction Center; and it is

FURTHER ORDERED that all steps taken by the Defendants to effectuate full compliance with the rules, be supervised, coordinated and approved by the Special Master, acting for the Court.

In this connection, the Special Master shall have the authority to state to the Defendants, their subordinates, and all the persons acting in concert with them, or any of them, the actions required to be taken by them, or any of them, to effectuate full compliance, and to seek Orders from Court requiring any or all of the Defendants, their subordinates, and persons acting in concert with them, or any of them, to show cause why they should not be punished as for contempt for failure to carry out such actions required; and it is

FURTHER ORDERED that the Defendants shall have sixty (60) days from the date of this Order in which to effectuate full compliance with those rules wherein the Special Master found noncompliance and said compliance by the Defendant shall include making any and all physical alterations and repairs to the Correction Center,

including repairing of the plumbing fix-
tures, painting of the showers and installa-
tion of the laundry facilities, and it is

FURTHER ORDERED because of the
disclosure of noncompliance contained in
the Fourth Report of the Special Master,
that the Special Master shall continue to
investigate the Defendants state of compli-
ance, and shall file a Report with this Court
within ninety (90) days from the date of
this Order.

For this purpose the Special Master shall
have all the authority granted to him by the
December 17th, 1976 Order of this Court.

IT IS SO ORDERED.

## FOURTH REPORT OF SPECIAL MASTER

Timothy J. Doyle
Special Master

32055 Grand River Avenue
Farmington, Michigan 48024

### INTRODUCTION

It has now been three years since a for-
mal, complete report of the Special Master
has been submitted to the Court in this
case. There are a number of reasons for
this, the most significant of which is the
decision to submit a set of Jail Rules and
Regulations to the Lucas County Court of
Common Pleas for adoption.

A brief review of the chronology of
events since the First Report is perhaps the
best way to introduce this report. How-
ever, before presenting this chronology, the
Special Master would like to express his
appreciation to the former Special Master
for his help and cooperation and also to the
various student assistants, Daniel Cron,
Bruce Beck, Amy Knowles, and Michael
Wagner, whose assistance has been invalua-
ble and without whose help, this report and
the accomplishments reflected in it would
not have been possible.

It was in late July of 1977 that the Court
adopted, without objections, the findings of
the Special Master in his First Report.
And, it would not be an oversimplification
to state that this First Report reflected a
general state of noncompliance on the part
of the Defendants. The Court thus in its
July 29, 1977 Order ruled as follows:

FURTHER ORDERED, because of the
disclosures of noncompliance contained in
the First Report of the Special Master,
that the Special Master shall continue to
investigate the Defendant's state of com-
pliance with the July 30, 1971 order of
this Court, as modified, and shall make
supplemental reports to the Court in the
event that further or continuing instanc-
es of noncompliance are discovered...

The former Master thus continued to
work in an effort to bring the Defendants
into a state of compliance with the Court's
Order and filed supplemental reports on
Discipline, Recreation, Contact Visitation,
and Classification.[1]

On July 25, 1978, the parties stipulated to
a disciplinary procedure which was then
introduced into the jail. Substantial
progress was also made toward reaching
agreement with respect to a new medical
services program, a contact visitation pro-
gram, and a complete classification proce-
dure. Before implementation of any of
these, however, the former Special Master
resigned and the present Master was ap-
pointed by Order of the Court dated No-
vember 16, 1978.

When the present Special Master took
over, the first order of business was to
oversee the implementation of the Defend-
ant Sheriff's plan of contact visitation. By
the Court's Order of August 29, 1978, the
Sheriff had ninety (90) days from the date
of said Order in which to implement a plan
of contact visitation. Within the allotted
time-frame, a plan was implemented and on
January 12, 1979, a stipulation regarding
contact visitation was filed by the parties.

1. Hearings were held in November of 1977 on
Classification, Discipline, Visitation, and Recre-
ation. On January 5, 1978, the Special Master
filed his Report, Findings and Recommenda-
tions regarding Classification, Discipline, and
Visitation. On August 29, 1978, he issued his
report regarding Recreation.

At approximately the same time (January 9, 1979 to be exact), the Defendant Commissioners contracted with Leroy A. Rodgers, M.D., of the Medical College of Ohio, Department of Family Medicine to act as Medical Director of the Lucas County Correction Center. Dr. Rodgers implemented an entirely new medical program using residents in the Department of Family Medicine to conduct sick call and to administer the necessary physical examinations.

As indicated previously, a classification procedure had been proposed at the time of the appointment of the present Master. A series of meetings was held with counsel as well as with various members of the Sheriff's staff and the Medical Director, and the final details were resolved in September of 1979.

While all of the above was taking place, the present Master was familiarizing himself with the case as a whole, reviewing files, pleadings, and reports, as well as the physical structure of the Correction Center itself. In addition, a series of meetings was held in late March and early April, 1979 with counsel for the respective parties. All of this was done with the goal of determining the overall state of compliance as of that time. It had been the intention of the Special Master to submit a full report to the Court in the Summer of 1979 detailing his findings with regard to the general state of compliance.

However, in May of 1979, the United States Supreme Court decided the case of *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) and this case changed the entire course of proceedings by the Court and the Special Master with regard to this case. While the *Wolfish* case considered five specific issues,[2] its impact is far greater because of its sweeping delineation of the powers a Federal Court has and does not have in reviewing prison and jail conditions. The Supreme Court's position on the powers of the federal judiciary is best summed up in Part V of the majority opinion, *Bell v. Wolfish, supra* at 562, 99 S.Ct. at 1886:

There was a time not too long ago when the federal judiciary took a completely "hands-off" approach to the problem of jail administration. In recent years, however, these courts largely have discarded this "hands-off" attitude and have waded into this complex arena. The deplorable conditions and draconian restrictions of some of our Nation's prisons are too well known to require recounting here, and the federal courts rightly have condemned these sordid aspects of our prison system. But many of these same courts have, in the name of the Constitution, become increasingly enmeshed in the minutiae of prison operations. Judges, after all, are human. They, no less than others in our society, have a natural tendency to believe that their individual solutions to often intractable problems are better and more workable than those of the persons who are actually charged with and trained in the running of the particular institution under examination. But, under the Constitution, the first question to be answered is not whose plan is best, but in what branch of the Government is lodged the authority to initially devise the plan. This does not mean that constitutional rights are not to be scrupulously observed. It does mean, however, that the inquiry of federal courts into prison management must be limited to the issue of whether a particular system violates any prohibition of the Constitution, or in the case of a federal prison, a statute. The wide range of "judgment calls" that meet constitutional and statutory requirements are confided to officials outside of the Judicial Branch of Government.

The Special Master, with the Court's backing and authority, has never attempted to do, and has never done more than to "scrupulously observe" the constitutional rights of the inmates. However, what the Constitution requires changes with the various decisions of the Supreme Court and

---

2. Double-bunking, "publishers-only" rule, receipt of packages containing food and other personal property, body cavity searches, and shakedown procedures.

*Wolfish* dictated such a change regarding the Court's power in jail cases.

It was thus the decision of the Special Master, with the knowledge and consent of the Court, not to submit a formal report in the Summer of 1979. Rather, it was decided that, if at all possible, the case would be transferred to the Lucas County Court of Common Pleas, who has statutory authority, see O.R.C. § 341.06 *et seq.*, to prescribe rules for the regulation of the Correction Center.

A set of rules was prepared by the Special Master which incorporated many of the paragraphs of the Court's initial July 30, 1971 Order, as modified; certain existing Common Pleas Court rules, as well as certain sections of the Ohio Revised Code. The purpose of proceeding in this fashion was basically two-fold. First, it was an attempt by the Court to comply with the mandate of *Wolfish*. And, secondly, it was seen as a way to preserve the accomplishments of this case and permit it to have enduring impact through the enforcement of its provisions by the Court of Common Pleas.

A proposed draft of jail rules was sent to counsel and to the Court of Common Pleas in October of 1979. As with every other aspect of this case, the rules provoked a great deal of discussion, debate, and disagreement. The parties submitted their proposed changes, additions, and deletions to the Rules, and a series of meetings was held in an attempt to reach a consensus on a final set of rules. Interspersed with these meetings were three pretrials held by the Court, the last one being held on April 25, 1980. At that time, decisions were made by the Court with regard to proposed rules on which the parties simply could not agree. Thus, a final set of rules was completed and submitted to the Court of Common Pleas. By Journal entry dated June 13, 1980, the Common Pleas Court adopted the rules and further agreed to hire a full-time jail monitor to enforce compliance with these rules.

The "Rules for the Regulation of the Lucas County Correction Center" are attached to this report as Appendix 1. It is

the position of the Special Master that these rules should be substituted for the provisions of the Court's original July 30, 1971 Order, as amended. The Court is intimately familiar with the content of the Rules. They, in large part, incorporate the provisions of the original Order, often expanding on it and certainly making it more specific and detailed. To the extent that certain paragraphs of the Court's Order have not been incorporated into the Rules, it reflects either the restrictions of *Wolfish* or the fact that these provisions were already covered by an existing Common Pleas Rule. The Court's belief that the Supreme Court has limited the authority of federal courts in the area of prison law is reflected procedurally by having the Rules prepared and submitted to the Common Pleas Court and substantively by the content of the Rules themselves. Given this belief in the propriety of proceeding in this manner, the Court should now confirm this belief by, itself, adopting the Rules as a substitution for its original Order.

Since shortly after the submission of the initial draft of the Rules, the Special Master has taken the position that compliance with the Rules should be sought as opposed to compliance with the original Order. And it is compliance with the Rules which has been monitored. Periodic correspondence has been sent to the parties indicating to them the state of compliance with respect to different Rules. It is the purpose of this report to analyze the state of compliance with respect to each Rule. Each Rule is discussed separately, and findings with respect to compliance have been made. Additionally, areas where further monitoring may either be helpful or necessary are pointed out.

### RULE 1

The Sheriff shall take charge and have control of all clothing, utensils, and other property belonging to the County in and about the Center, and pertaining to the kitchen, laundry, storeroom, wash rooms, bath rooms, and other parts of the Center and residence. The Sheriff shall see that

the property in his control shall be properly preserved and in good working order.

■ The Sheriff certainly is in substantial compliance with respect to having charge and control of the property of the Correction Center, although this authority is delegated to the various staff members whose functions and duties mandate that they directly control various items of property (e. g., Food Service Director—kitchen equipment, supplies, and utensils; Property Officer—linens and clothing, etc.) With regard to the condition and working order of the property, this is covered extensively in the analysis of various subsequent Rules such as Rule 5—Lighting; Rule 6—Food; and Rule 11—Hot and Cold Water. To set forth the same analysis here would be redundant. However, to the extent that any non-compliance is found with these other Rules, the Defendants will also be in a state of non-compliance with Rule 1.

## RULE 2

The Sheriff shall enter and keep in a book in his possession an inventory of all the property of every kind and description belonging to the County and pertaining to the Center, including utensils, clothing, bedding and other goods.

■ The Property Inventory Book is kept by the Sheriff. It is all inclusive as required by the Rule and it is current. It is, therefore, the finding of the Special Master that the Defendants are in substantial compliance with the provisions of this Rule.

## RULE 3

The Sheriff shall provide the Court Administrator with a Center report by the third working day of each month clearly stating the name and booking date of each inmate.

■ The Report required by this rule is prepared by the Records Officer and sub-

mitted to the Court Administrator in a timely fashion. Thus, it is the finding of the Special Master that the Defendants are in substantial compliance with the provisions of the Rule.

## RULE 4 POPULATION [3]

■ Sub-rule (a) which limits the number of inmates that may be housed on the third, fourth, fifth, and sixth floors to 226 is taken directly from the Court's Order of July 29, 1977. The figure is derived from the fact that there are 58 single cells on the third, fourth, and sixth floors, and 52 single cells on the fifth floor. The Court's Order was designed to ensure that there would be no double-bunking, and sub-rule 4(d) makes it clear that no more than one (1) inmate shall be housed in any regular housing cell.

Each week, the Special Master receives copies of the daily Shift Commander's Information Sheet.[4] This form is, in effect, a daily population report, indicating the total number of individuals housed in the facility, the gender of each, and how many were housed on each floor.

From reviewing the Shift Commander's Information Sheet, from discussions with various members of the Sheriff's staff, and from personal inspections both by the Special Master and his associates, it is clear that at no time has double-bunking occurred in the Lucas County Correction Center. There were several occasions when two females were placed in an individual cell in the booking area for a short period of time (one or two hours.) This resulted from the fact that one of the two cells assigned for females in the booking area was occupied by an inmate who was physically acting out. When a third female inmate had to be held in booking, there was nowhere to place her but in the other female cell which was also occupied. However, the door was left open and the situation was not uncomfortable. And, as indicated, the time period was very short.

---

3. Henceforth, the entire Rule will not be set forth at the beginning of each section. Since the Rules are attached as Appendix 1,* this is unnecessary. Rules 1, 2, and 3 did not lend themselves to short titles.

* Available copy of Appendix 1 is illegible, and hence not reproduced.

4. A sample of this form is attached hereto as Appendix 2.

The fact that the Defendant's adhered to this rule and did not double-bunk does not mean that population is not a problem at the Lucas County Correction Center or that the facility has never been overcrowded. In fact, the contrary is true. In addition to the 226 regular housing cells on the third, fourth, fifth, and sixth floors, there are 24 individual cells on the second floor which are normally used to house inmates with medical problems and inmates who have not as yet been classified. There is also a dormitory on the fifth floor for Trusties which houses approximately 20 inmates when filled. Thus, there is room for approximately 270 inmates "upstairs" in the Correction Center.

The booking and receiving area has the capacity to hold an additional 65 inmates (20 individual cells and three (3) fifteen (15) man bullpens.) However, the booking area is designed as a short-term holding facility, and certainly not as a regular housing area. Yet, if the 270 cells upstairs are filled, there is no place left to house inmates except in booking. And, this is what is done.

The most serious population problem during the tenure of the present Special Master occurred in May of 1979 and again in September-October of 1979. It was not uncommon during these periods to have more than 330 inmates housed in the facility. With the upper levels completely filled, inmates spent as long as seven days in the booking area. During the Labor Day weekend in 1979, the problem with respect to female inmates was so critical that cots were set-up in the day room areas of the female modules on the third floor.

When booking was holding a female, the third floor counselor was contacted. A brief interview would then take place, and the counselor would have a cot assigned for the inmate in one of the three dayrooms.[5] While the counselors did a commendable job of ensuring appropriate classifications, this was obviously an unsatisfactory situation, and it was fortunate that that particular population crisis subsided by the conclusion of the weekend.

In May of 1979, a number of other measures was taken by the Sheriff and his staff in an attempt to alleviate the temporary overcrowding. The Adult Parole authority was asked to review the situation of any inmate housed for parole violations; the Prosecutor's Office was asked to review cases where inmates charged with lesser felonies or misdemeanors were unable to make relatively low bonds; the Probation Department was asked to expedite Pre-Sentence Investigation reports, and Work Release was asked to review a list of female inmates who had been sentenced by Municipal Court to determine if any were eligible for that program.

However, the most effective measure in terms of reducing the population was the transferring of sentenced county inmates, including some Trusties, to the Toledo House of Correction (the Workhouse.) This was done in both May and September of 1979, with the approval of the Special Master and the Court. It was agreed that this was a temporary, emergency measure and not one which could be used regularly without making substantial changes in the Workhouse.

It is the opinion of many that use of the Workhouse represents a long-range solution to the population problem. As early as October of 1977, the Court met with representatives of both the Common Pleas Court and the Municipal Court to discuss the problem of over-population. (There had been an overcrowding problem in the Jail in September of 1977.) It appears that all Judges agreed that if the administration of the Corrections Center and the Workhouse could be unified, with the latter being brought up to constitutional standards, this would go a long way toward solving the population problem. Discussions and negotiations were held in late 1977 and early 1978, but to no avail. When the population crisis in the Spring of 1979 arose, again the City and County were notified of the Court's interest in attempting a unification of the two facilities. Discussions once

5. No more than four (4) females were bunked on cots at any one time.

again commenced, and again they proved fruitless.

The major stumbling block[6] in the negotiations apparently was the disparity in salaries between the City and County employees. The employees of the City at the Workhouse are paid substantially more for similar jobs than are the county employees at the Correction Center. And, since both the County and the City have union contracts with their employees, the labor problems presented by any unification are enormous and apparently insurmountable.

Despite the above, it appears that the population problem at the Correction Center is not unsolvable. In the Spring of 1979, Toledo-Lucas County was awarded a grant by the Law Enforcement Assistance Administration to participate in Phase One of a Jail Overcrowding and Pre-trial Detainee Program. Phase One consisted of the collection of data concerning félony and misdemeanor offenders in Lucas County. Exhaustive information was gathered on the type of individuals who were processed through the criminal justice system in Lucas County, as well as the length of time it takes for a defendant to progress through each stage of the process (e. g., booking to preliminary hearing; preliminary hearing to indictment, etc.) The data was collected by the Toledo, Lucas County Criminal Justice Regional Planning Unit in conjunction with the Corrections Coordinating Council of Lucas County. At the end of Phase One, the data was synthesized and analyzed and a Jail Population Management Plan was prepared. This Plan[7] was then submitted to LEAA for Phase Two funding, and recently (June 12, 1980) the Jail Population Plan was approved and is in the process of being implemented.

The Jail Population Management Plan consists of three parts, all of which will be integrated into a working whole with the aim of reducing the Jail population, as well as positively affecting the administration of justice in Lucas County. The three parts are System Flow, Pre-Trial Services, and Mobilization of Community Resources.

The System Flow portion of the Plan is aimed at reducing the processing time at each stage of the criminal justice process. For purposes of analysis, the plan found the following stages in the criminal justice process significant:

1. Arrest
2. Initial appearance in Municipal Court
3. Preliminary Hearing
4. Grand Jury
5. Arraignment
6. Trial
7. Pre-sentence Investigation Report
8. Sentencing
9. Transport.

The Plan then indicates that the portion of defendants held in custody during all or part of the time their case is pending accounts for 69.6% of the facility's average daily classified population.[8] It then further found that reducing the processing time between any or all of the key events in the criminal justice process would significantly reduce jail population.[9]

The Plan projects the use of such tools as the "Same Day Grand Jury," and Pre-trial Conferences, to reduce processing time. It also forecasts greater use of computerized information to reduce the time needed to prepare Pre-sentence Investigation Reports and further indicates that it will be possible to transport an individual sentenced to a state or federal penitentiary to said institution on the same day that the sentencing occurs.[10]

---

6. Apart from bringing the Workhouse under the Court Order, thus requiring major alterations and improvements.

7. See, Jail Population Management Plan, Toledo-Lucas County Criminal Justice Regional Planning Unit, April 19, 1980.

8. *Id.* at p. 660.

9. It is indicated that if the total processing time could be reduced by 20%, the reduction in the average daily population would be 44 persons. *Id.*, at p. 660.

10. A summary of Plan's projected System-Flow reduction is attached as Appendix 3.*

 * Available copy of Appendices 3 and 4 is illegible, and hence not reproduced.

The second section of the Jail Population Management Plan involves a number of Pre-trial Services which would be made available to ensure that only those individuals who absolutely have to be incarcerated either for society's protection or for the appearance of the defendant in Court, actually wind-up as a member of the Jail population.

The services encompassed in this second phase of the Plan would primarily be rendered by a Central Intake Team [11] located in the booking and receiving area of the Correction Center. This Team would consist of a Toledo Police Department Command Officer, Court Intake Officer, County Prosecutor, Booking Officer, Jail Classification Officer, and a Jail Counselor. The primary objective of this Team is to, in all appropriate cases, keep individuals charged with a crime out of jail. One way in which it is hoped that this goal will be achieved is by the expanded use of citations by the Police Department on the street. Ohio law allows the use of citations in minor misdemeanors.[12] The Plan study found that the police presently are using this method of release sparingly and that misdemeanor bookings could be reduced by approximately 20%,[13] if greater use is made of citations.

In addition to the use of citations, the Plan, through its Central Intake Team, plans to take greater advantage of the use of summons as well as other forms of bond or O.R. release.[14] It finds that far too many individuals charged with misdemeanors, as well as some charged with felonies, are spending much more time in jail than is necessary to ensure their appearance in court.

Finally, it will be the function of the Central Intake Team to screen all cases which come into the booking and receiving area of the Correction Center, not only to ensure the proper use of citations, summons, O.R., or other types of bonds, but also to ensure that the charges alleged are proper and justified and to ensure that accurate and timely information is properly recorded in the computer terminal. Cases will further be screened to determine if the individual involved is suffering with an alcohol or drug related problem or perhaps from some mental disability. It is the hope of the Population Management Plan that appropriate diversion programs can be established so that such individuals, if in need of confinement, may have it in an agency trained to deal with their particular affliction, and not in the Correction Center which is not geared to helping such individuals.[15]

11. See Appendix 4.*
 * Available copy of Appendices 3 and 4 is illegible, and hence not reproduced.

12. See, Rule 4.1, Ohio R.Crim.Proc.

13. See, Jail Population Management Plan, *supra*, at p. 32.

14. The Jail Population Plan is highly critical of the present Pre-trial Release Program operated as a division of the Toledo Legal Aid Society. The Plan suggests that pre-trial release should come under the direction and control of the Common Pleas Court. It finds the present program to be inadequate with respect to the number of people interviewed, the number recommended for O.R. bond, the system (objective-points plus Vera Scale) used to determine qualification for O.R. bond, the high failure to appear rate of individuals released per the recommendation of Pre-trial Release, and the poor records and statistics kept by the present program. It should be noted that these allegations are denied in total by the Director of the present program and by the Toledo Legal Aid Society. On April 8, 1980, a hearing was con-

ducted by the Lucas County Board of Commissioners to discuss these charges and more directly whether the program should be taken over by the Common Pleas Court. After hearing testimony for several hours on both sides of the issue, the Commissioners referred the matter to committee for further study and analysis. (It should be noted that it was alleged that the program would be far less costly if conducted by the Common Pleas Court.) Finally, in this regard, it should be pointed out that Paragraph 11 of the Court's original Order which concerned pre-trial release was not carried forward into the Rules. Such a program is now left to the sound discretion of the Defendant Commissioner and the Court of Common Pleas. However, were this report considering the Court's Order, a finding that the present program complied with Paragraph 11 would have been made.

15. A summary of the Pre-trial Services and the Central Intake Team are attached as Appendix 4.*
 * Available copy of Appendix 4 is illegible, and hence not reproduced.

It is primarily in relation to the diversion programs mentioned above that Section Three of the Jail Population Management Program is concerned. It is entitled "Mobilization of Community Resources." This portion of the Plan "is based on the assumption that resources exist in the community which can be utilized as an alternative to incarceration ... and that where resources do not exist, the community should be mobilized to develop them."[16]

A study done in with the preparation of the Jail Management Population Plan indicated prevalent overcrowding conditions in the booking area on weekends.[17] This is the result of weekend commitments which average approximately 15.[18] The study further indicates that a large percentage of these commitments as well as of others who are processed through the booking area on weekends are drug or alcohol dependent, and thus are potential diversion candidates.

In addition, a study conducted by the Court Diagnostic and Treatment Center[19] indicates that 35% of all persons booked have drug or alcohol related problems and 9% of all individuals booked are suffering from some sort of emotional illness (3% of all bookings apparently have quite severe mental illnesses.)

Thus, it is clear that alternative placement centers, both pre-trial and sentenced, are imperative. And, while the Population Plan indicates that some alternatives are available,[20] especially for those not suffering from alcohol, drug, or mental health problems, there is a severe shortage of diversion alternatives for the substance abuser or mentally ill inmate.

The Jail Population Management Plan with its Central Intake concept is extremely important for the future of the Lucas County Correction Center. As indicated above, overcrowding will make compliance with all of the other rules nearly impossible. And, with the unification of the Correction Center and the Workhouse a very dim possibility, the Jail Population Plan appears to be the only realistic alternative to the physical expansion of the Correction Center itself.

The Plan is just now being implemented and it is too early to tell whether it will have the desired effects. But, it should be given every opportunity to succeed. To do this, it will take the cooperation of the City and County Courts,[21] the City and County governments, and the various mental health agencies.[22] Absence of support from any one of these sources could doom the system to failure. And, while monitoring of the Central Intake system itself, though certainly not of the population, may be beyond the scope of this case, it is strongly recommended that both be given a careful eye by the Court of Common Pleas and its Jail Monitor under the Rules.

### FINDINGS RELATING TO COMPLIANCE

It is the finding of the Special Master that the Defendants have not exceeded the population limits set forth in Rule 4(a). It is further found that a proper segregation

16. Jail Population Management Plan, *supra*, at p. 41.

17. *Id.*, at p. 42.

18. *Id.*

19. *Inmate Population Study*, Court Diagnostic and Treatment Center, (1979).

20. A summary of the Diversion Alternatives is found in the Jail Population Plan and attached as Appendix 5.*

 * Available copy of Appendix 5 is illegible, and hence not reproduced.

21. See, Journal Entry, Lucas County Court of Common Pleas, *Re: Support of the Lucas County Central Intake Unit*, filed June 9, 1980, wherein the Common Pleas Court expressed its support for the concept of Central Intake but deferred support for specific staffing levels, and policies and procedures until after review by a standing committee of Judges for the Common Pleas Court and the Municipal Court.

22. Assistance from the Toledo Mental Health Center, the 648 Board, and the various regional mental health units are crucial to the success of the case diversion program. In this regard, it also appears that the inclusion of a mental health professional on the Central Intake Team would be essential to the achievement of appropriate placements.

of inmates has been maintained and that no more than one (1) inmate has been housed in any regular housing cell. Thus, the Defendants are in substantial compliance with all of the provisions of Rule 4.

## RULE 5 LIGHTING

 The original Court Order required the Correction Center to comply with Section 7.04 of Regulation A1–68 of the Toledo District Board of Health. This regulation basically required that each cell contain one ceiling-type electric light fixture. When the former Special Master originally inspected the Correction Center, he found that forty-eight (48) cells did not meet the specifications of the Board of Health Regulation. The Special Master also found that the original lighting in the Correction Center did not provide sufficient illumination.

Thus, on April 18, 1977, the parties entered into a Stipulation to correct the lighting situation. It was agreed that all cells would contain a ceiling-type electric light fixture and further that said fixture would provide at least thirty (30) foot candles of illumination.

By the time of the filing of the First Report of the Special Master, the Stipulation had not been carried out. In fact, it was not until November 10, 1977 that bids were let on the light fixtures, and it was not until the Spring of 1978 that the fixtures were actually installed.

The light fixtures were checked by the assistant to the Special Master just after installation and again in February of 1979 and found to be adequate and in compliance on both occasions.

Rule 5 of the Rules and Regulations of the Lucas County Correction Center requires that lighting in all parts of the Center be sufficient to ensure safety and further to be adequate for reading, writing, working, recreation, and other activities.

Thus, the lighting continued to be monitored by the Special Master. And, while the lighting in the cells was at all times found to be in compliance, in early 1980, problems were discovered in Module lighting.

In a check conducted by the Special Master's assistant on January 7, 1980, one-half (½) of the Module lights in 3 West and 3 Southwest were found to be burned out or otherwise not functioning. Similar, though less severe, problems were discovered in 4 Southwest, 4 Northwest, and 4 Southeast. This was brought to the attention of the Sheriff by the Special Master, and by the end of March, 1980, all non-functioning Module lights had been repaired.

In June of 1980, it was discovered that a number of lights in the gymnasium were not functioning. Again, the matter was brought to the attention of the Defendant Sheriff, and these lights were repaired in July of 1980.

## FINDINGS RELATING TO COMPLIANCE

It is the finding of the Special Master that the Defendants are in substantial compliance with Rule 5 of Rules and Regulations of the Lucas County Correction Center.

## RULE 6 FOOD AND FOOD SERVICE

Certainly as much, if not more, attention has been given to the area of food and food service by the Special Master than as to any other aspect of the case. One reason for this is that the food service process is on-going, day in and day out, and in order to accurately determine patterns of behavior, a great deal of time spent observing the operations is necessary. A second reason for closely scrutinizing food service is the importance given to it by the inmates. When one is incarcerated, there is often little to look forward to other than the next meal, and thus inmates are quick to point out even the slightest flaw in the system. However, perhaps the most important reason for carefully reviewing and monitoring the food system is its effect on the overall sanitation throughout the Correction Center. With meals not served in a central dining facility, but rather in the modules on each floor, the possibility of spreading filth, vermin, and disease exists unless careful

controls are maintained on the food services operation.

There should be no doubt that in the Lucas County Correction Center, the preparation and serving of food is a major operation. In 1977, 248,917 meals were served.[23] In 1978, this figure increased to 308,893, and in 1979, it further increased to 368,647. The amount of money spent in this area also is substantial, ranging from over $254,000.00 in 1977 to just under $320,000.00 in 1979.[24]

The former Special Master, in his First Report to the Court, found generally that the Defendants had failed to comply with paragraph 4 of the Court's original Order. He found that meals did not meet minimum nutritional standards and that food was not served at proper temperatures or in reasonable variety. He further found that the Ohio Department of Health Regulations for food service operations were not being met by the Correction Center with regard to sanitation, equipment, food storage, and employees. He finally indicated that additional health inspections were necessary.

In June of 1978, the Special Master had the food service operations of the Correction Center reviewed by Mr. James T. Wahl, Sr., a food service consultant from Bowie, Maryland. And, while Mr. Wahl's report is very much cost oriented, he did find that many of the same problems elicited in the Master's First Report continued to exist. Mr. Wahl found poor temperature controls on food, unsuitable food carts, as well as other unsuitable equipment, poor sanitation, and an inappropriate menu.

It was clear from the initial report of the Special Master, the report of Mr. Wahl, as well as from personal observation, that changes were going to have to be made in the kitchen operation if the problems were ever going to be solved. Mr. Wahl recommended the "Microwave Meal Delivery System," which involved the use of mobile microwave ovens in connection with refrigerated food carts.

The Special Master recommended a hospital-type unitray system which would allow the preparation of the trays in the kitchen, and their storage in compartmentalized carts designed to keep both hot and cold foods at proper serving temperatures.

However, after the Sheriff and County Commissioners investigated the matter, reviewed the above two approaches, as well as literature on other available systems, it was decided that the Szabo Food Service Company of Birmingham, Michigan would be hired to operate the entire food service operation at the Lucas County Correction Center.

Under either of the systems recommended by Mr. Wahl or the Special Master, the Director of Food Services in the Center, would continue to operate the kitchen, but with the advantage of having the microwave or uni-tray equipment available to improve service.

Under the new contract, Szabo will bring in its own people and/or hire present kitchen staff and will direct the entire operation from the purchasing of food, to the preparation of meals, to the cleaning and sanitizing of the kitchen.

In reviewing the kitchen operations at the Correction Center, the Szabo people found many of the same shortcomings previously mentioned. To overcome these deficiencies, Szabo has proposed the use of its own 14-day cycle menu,[25] which they guarantee to meet minimum nutritional standards of the National Academy of Sciences,[26] as well as the requirements propounded by the American Correctional Association. In addition, Szabo has requested,

---

**23.** It should be recalled that the inmates spent the first four months of 1977 in the old Lucas County Jail and the balance of the year in the Lucas County Correction Center.

**24.** For the first three months of 1980, costs for meals averaged in excess of $25,000.00 per month.

**25.** see Appendix 6.*

 * Available copy of Appendix 6 is illegible, and hence not reproduced.

**26.** *Id.*

and the Defendant Commissioners have agreed, to purchase the following control equipment:

(a) 1 ea. Groen Model No. FPC–3 Electrically Heated, Tilting, Braising Pan

(b) 1 ea. Blodgett Model No. 1220 Electric Baking and Roasting, Double Stack Deck Oven

(c) 1 ea. General Electric Model No. DK50, Dimension II, High Capacity Fryer

(d) 1 ea. Shelcon, Inc. ShelConserve Model No. ETA–15, Motorized, tray assembly conveyor.

It was determined that this equipment is compatible with the existing equipment in the Correction Center and also can be installed without alterations to either the physical plant or the exhaust ventilations system.

In addition, it was agreed that the Alladin Meal Delivery System would be purchased. This system is comprised of individual meal trays [27] which are insulated to maintain food temperature. When the trays are stacked one on top of the other, cavities in the trays form thermal columns, so a cavity in one tray shares temperature with the same cavity of the tray above and below it. The trays are then stacked together, and the stacks are then loaded on two shelf, stainless-steel utility carts for delivery to the floors. One cart will be used for each floor, and they require no electrical power.[28]

Szabo indicates that its system will not only be of higher quality and more efficient, but also will be substantially less expensive. It proposes to charge the Correction Center $1.31 per meal for each meal served. This price includes all food, labor (excluding inmate labor), cleaning, and paper supplies, taxes, licenses, administrative expenses, and an equitable profit.

Szabo is supposed to begin operation September 1, 1980. And, while the Special

Master is hopeful that it will accomplish all of its goals and thus solve many of the problems now existing in the Correction Center, this remains to be seen. Careful monitoring will be required to ensure complete compliance with the Rules.

Since, at the time of the writing of this report, the new system is not yet operable, this report must deal with the system that has been in operation at the Correction Center since its inception, and examine the current status of compliance. This will be done by reviewing each subpart of Rule 6.

RULE 6(a)

■ This rule requires the food to be sufficient, wholesome,[29] and properly cooked. In this connection, it should be noted that Ohio Department of Health Regulation 3701–21–05(B) requires that:

All food shall be clean, free from unwholesomeness, free from spoilage, and otherwise safe for human consumption....

Given the volume of food that is prepared, as mentioned above, the number of instances of food contamination are few. This is not to say that it does not happen. The instances of bugs or vermin contaminating food are much less frequent now than in 1977 and 1978, although Corrections Officers have indicated to the Special Master that this does occur. The last reported case (which was confirmed) occurred in November of 1979, where the oatmeal served for breakfast was generally contaminated by vermin. On this date, the oatmeal was returned to the kitchen for a substitute meal.

There has also been some instances where the food has not been properly cooked. The most frequent occurrence is the under-cooking of eggs in the morning. Again, however, the occurrences have been few.

This Special Master thus finds that the food provided by the Sheriff is, on the whole, properly cooked and wholesome.

27. Id.

28. As discussed below, this is one of the major problems with the present system.

29. The Special Master is considering "wholesome" to mean unspoiled rather than nutritionally sufficient. The nutritional value of the food is discussed in detail, infra.

## RULE 6(b)

■ Rule 6(b) requires that the food and food service meet and comply with certain specific conditions and standards.

The first requirement (Rule 6(b)(1)) is that the food meet minimum nutritional standards. At the time of the First Report of the Special Master, the Food Director was using a seasonal cycle menu. This menu was evaluated by several registered dieticians and was found to be deficient with respect to vitamin C content. It was also recommended by the evaluating nutritionists that the Food Director change to a three to five week cycle menu which they believed would be more beneficial for both ordering and preparing food.

The Food Director did, in fact, switch to a thirty (30) day cycle menu,[30] and the present Special Master has had this menu evaluated for its nutritional content.[31]

The evaluation was based upon the 1980 Revised Recommended Dietary Allowances as determined by the Food and Nutrition Board, National Academy of Sciences—National Research Council, Washington D.C.[32] The evaluation was further based upon the Recommended Dietary Allowances for young adult males of average height and weight having a moderate activity level, since this population group requires the highest dietary allowances.

The following chart lists the essential nutrients, the recommended dietary allowances for these nutrients, the average daily intake at the Lucas County Correction Center and whether the intake meets or does not meet the recommended allowances for each nutrient.

### NUTRIENT EVALUATION PER DAY

| Nutrient | RDA | Average Daily Intake | At or Above RDA | Below RDA |
|---|---|---|---|---|
| Calories | 2900 kcal. | 2992 kcal. | X | |
| Protein | 56 gm. | 99 gm. | X | |
| Vitamin A | 1000 mcg. R.E. or 5000 I.U. | 13,570 I.U. | X | |
| Vitamin D | 7.5 mcg. Chole. or 300 I.U. | 306 I.U. | X | |
| Vitamin E | 10 mg. alpha T.E. | (13) | (X) | |
| Vitamin C | 60 mg. | 122 mg. | X | |
| Thiamin | 1.5 mg. | 1.6 mg. | X | |
| Riboflavin | 1.7 mg. | 2.5 mg. | X | |
| Niacin | 19 mg. N.E. or 19 mg. | 21 mg. | X | |
| Vitamin $B_6$ | 2.2 mg. | 2.22 mg. | X | |
| Folacin | 400 mcg. | 374 mcg. | | X |

30. A sample menu is attached as Appendix 7.*
 * Available copy of Appendices 7 and 8 is illegible, and hence not reproduced.

31. The evaluation was done by Maxine Harlan, M.A.R.N., who is employed by the Oakland County, Michigan Board of Health.

32. see Appendix 8.*
 * Available copy of Appendices 7 and 8 is illegible, and hence not reproduced.

NUTRIENT EVALUATION PER DAY

| Nutrient | RDA | Average Daily Intake | At or Above RDA | Below RDA |
|----------|-----|----------------------|-----------------|-----------|
| Vitamin $B_{12}$ | 3.0 mcg. | 4.9 mcg. | X | |
| Calcium | 800 mg. | 997 mg. | X | |
| Phosphorus | 800 mg. | 1394 mg. | X | |
| Magnesium | 350 mg. | 388 mg. | X | |
| Iron | 10 mg. | 23 mg. | X | |
| Zinc | 15 mg. | 19 mg. | X | |
| Iodine | 150 mg. | (260 mcg.) | X | |

It is thus readily apparent that only with respect to the intake of folacin, or folic acid, is the menu deficient. The nutritionist found this deficiency to be the result of the relative low level of green, especially leafy green, vegetables in the menu. She suggests that brocoli or spinach be substituted for a starch preferably on a weekly, but at least on a bi-monthly, basis. Other changes which would correct this problem would be more frequent use of green, leafy salads or the substitution of whole wheat bread for white bread.

Other suggestions made by the nutritionist, although not necessary to meet the required allowances, include: the exclusive use of iodized salt; the substitution of low-fat or non-fat milk for homogenized milk; and an increased fiber content in the menu.

It must be noted, however, that the above evaluation is based on the assumption of proper food handling and preparation techniques and is further based on the assumption that the quantity called for in the menu is actually served.

In fact, the last assumption is probably erroneous. Under the system employed at the time of this writing, the quantity of food served to each inmate is not uniform nor consistent. As indicated above, the individual trays are not prepared in the kitchen. Rather, a sample tray is prepared and sent to each floor with the food. The servers, of course, are supposed to prepare each individual tray in accordance with the portions on the sample trays. This is not done. More often than not, the sample tray is set on the floor and ignored and the server then uses his own discretion regarding portion sizes. As indicated, this leads to inmates receiving different portion sizes of the same meal, as well as receiving varying portions from one meal to the next. Thus, the nutritional content of a meal, at any given time, could be, and often is, different from that of the meal as planned on the menu.

Rule 6(b)(2) requires the food to be served at proper temperatures, be fresh, and be served in reasonable variety.

The First Report of the Special Master found the food served to be fresh and except for some isolated instances, as mentioned above, there is no indication that this situation has changed.

It is also the finding of the Special Master that with the advent of the thirty (30) day cycle menu, the food served has reasonable variety. The adequacy of the variety of the food is confirmed both in the report of Mr. Wahl as well as in the evaluation of the nutritionist.

The ability to serve food at proper temperatures, however, is totally unsatisfactory. The food, of course, is prepared in the kitchen on the basement level of the Correction

Center and put into serving containers which are then placed in warming carts used for delivery of the food to the various housing floors. And, while these warming carts are plugged into electrical outlets in the kitchen at least an hour before serving time, they are not adequate to keep hot food at a reasonable temperature. On June 7, 1979, the process of keeping food at proper temperatures was investigated and evaluated by the Board of Health. The report indicates the process to be deficient in several respects. First, the food warming carts are not capable of performing their intended function which is to maintain a temperature of 140° F when empty. The National Sanitation Foundation standard on electric warming equipment[33] requires this type of unit to be capable of maintaining food at 150° F or higher.

The Board of Health report also indicates a difficulty in dispensing food due to small work space on the carts and further finds that carts were not being plugged in immediately after being left at a particular floor.

With respect to this last noted deficiency, the Special Master finds it inexcusable. On occasions too numerous to mention, the problem of Correction Officers and trusties not plugging the carts in immediately was brought to the Sheriff's attention. And, while directives were issued from time to time, the problem continued and has not yet been completely alleviated. There is no reason to take an already bad system and make it worse by failing to do something as simple as putting a plug in the wall.

It should also be noted that with the present system, there is no capability of keeping cold food properly cool. There are no refrigerated carts. And so, cold food sits on the serving carts for a substantial period of time (up to an hour) before actually being served, and is thus probably closer to room temperature than proper serving temperatures when served.

Rule 6(b)(3) requires serving methods to meet minimum health and sanitary standards for food service in restaurants. Rule 6(b)(5) requires persons working in and around the kitchen and with the handling and serving of food to meet the applicable restaurant and health requirements. And, since these two sub-rules, as well as the applicable standards, overlap, they will be considered together.

Ohio State Department of Health Regulations 3701–21–04M and 3701–21–04N state as follows:

3701–21–04M—All employees shall wear clean garments and shall keep their persons neat and clean at all times while engaged in the handling of food or utensils. No employee while engaged in preparing or serving food shall use tobacco in any form.

3701–21–04N—All employees shall wear their hair, natural or artificial, clean and neat, and under control at all times so that:

(1) There shall be no undue handling of hair.

(2) Hair should not come into contact with food or food contact surfaces.

(3) Loose hair shall be prevented from falling into food or on food contact surfaces.

All employees, including trusties, are required to and do shower daily. In addition, adequate facilities are available to permit hands to be washed as frequently as necessary.

On several occasions, reports were received that there were insufficient trusty uniforms. This was brought to the attention of the Food Director who then ordered more. The present policy of the Food Director is to provide clean uniforms to employees as often as necessary but not less than every other day.

A major problem in the area of handling and serving food is the unwillingness of the individuals involved to consistently wear hats and gloves. This requirement was constantly checked by the Special Master's As-

**33.** Std. No. 4, § 2.20, Food Service Equipment Standards, National Sanitation Foundation (1978).

sistants, and it was the exception rather than the rule when they would report that all required personnel were wearing hats *and* gloves. This situation, on several occasions, was brought to the attention of the Defendants, and while the situation greatly improved, there are still occasions when either hats or gloves, or both, are not worn as required.

. The Special Master found no evidence that tobacco was being used, in any form, during the actual preparation and serving of food.

Finally, with respect to the kitchen employees, Department of Health Regulation 3701-21-06(1) requires that "No person afflicted with a disease in communicable form, or who is a carrier of a communicable disease shall work in any food service operation." The written policy and procedures of the Lucas County Correction Center, Section I.05.14 require that "All persons working in the preparation and serving of food shall first be examined and approved by the medical staff and meet restaurant health requirements." This policy, however, is not followed. Although all trusties are given physical examinations by the medical staff, the Special Master was informed by the Food Director that the civilian kitchen employees are not required to submit to such examinations before commencing employment. Without such an examination, of course, it is impossible to know whether a communicable disease is being carried.

There are also no regular check-ups provided to either trusties or civilian employees to ensure that no communicable disease. is present.

Rule 6(b)(4) requires the kitchen, kitchen equipment, food storage, and sanitation to meet the minimum standards for restaurants.

The first applicable Ohio Department of Health Regulations is 3701-21-04A which reads:

Every food service operation and all parts thereof and places appurtenant to the food service operation shall be maintained in good repair and shall be kept thoroughly clean and and free from any accumulation of filth, garbage, rubbish, or other waste.

The problems which were discovered in this area pertain less to the kitchen, itself, than to the "places appurtenant to the food service operation." Upon the numerous inspections of the kitchen area by the Special Master and his assistants, it was generally found to be clean and in good order.[34] The problem areas consisted of the service elevator, the landing area, and, to a lesser extent, the service areas.

It should be noted, however that as problem areas were pointed out to the Defendants, corrections were made and the kitchen sanitation on the whole was greatly improved during the term of the present Master.

The biggest problem has been the failure of Corrections Officers and trusties to collect *all* trays at the conclusion of a meal. It is not an unusual occurrence to find dirty trays on the floor outside the service elevator. This occurs as a result of the failure of those who collect trays to wait until all inmates have finished their meal, as well as to then insist on getting a tray back from every inmate. Trays are also left on the floors by corrections officers when they finish eating, and they are not returned to the kitchen until the time of the next meal. Leaving trays on the floor in this fashion spreads germs, invites vermin and thus causes an obvious health problem.

The next applicable health regulation is 3701-21-04H which reads:

Cleaning and bactericidal treatment of utensils and fixtures.

(1) All utensils and fixtures shall be kept clean and free from dust, dirt, insects, and other contaminating material. All cloth, sponges, brushes, and similar items used by employees shall be clean. Single-service containers shall be used only once.

---

**34.** Problems and violations found by the Health Department will be covered in the discussion of Rule 6(b)(6), *infra.*

(2) All multi-use utensils used by the consumer shall be thoroughly cleaned and effectively subjected to an approved bactericidal process after each usage. All other multi-use utensils shall be thoroughly cleaned and subjected to an approved bactericidal process immediately following the day's operation.

All meals are served on trays which are used repeatedly for each meal. After each meal, the trays are returned to the kitchen and scraped, washed out by hand and placed in a dishwasher where they are cleaned and sterilized. This process is normally sufficient, although there have been isolated instances of trays coming out dirty. A bigger problem with respect to trays is that they are apparently used as ashtrays. A great many of them have burn marks on them, and some have been declared unusable by the Health Department. Since a new system, with new, more expensive trays, is being implemented, all necessary precautions should be taken by the Sheriff to ensure that this problem does not continue.

Problems were also encountered concerning the cup and spoon which are issued to each inmate upon being classified into the regular population. Initially, it was determined that the inmates would use this same cup and spoon for each meal and be responsible for cleaning and sanitizing them. This system proved unsatisfactory from a sanitation point of view. It was therefore changed, and now every inmate's cup and spoon are collected after breakfast and returned to the kitchen where they are properly cleaned and sanitized. A clean cup and spoon are then returned with the noon meal. While this new method has placed an added burden on the kitchen staff because of the additional dishwashing, they have responded well.[35]

With regard to the fixtures in the kitchen, the Special Master and his assistants have found them to be clean and sanitary. The floor of the kitchen is mopped several times a day, and the other fixtures are cleaned regularly to keep it in a sanitary condition.[36]

Department of Health Regulation 3701–21–04(5)(2) states:

Garbage if stored shall be stored in rodent proof containers. Such containers shall be provided with tight fitting lids except when in regular use in food preparation areas. Refuse other than garbage shall be kept in suitable receptacles, in such a manner as not to become a nuisance. Garbage and other refuse shall be disposed of in a safe and sanitary manner.

Garbage in the Correction Center is not stored. It is disposed of regularly by use of an automatic garbage disposal. Refuse other than garbage is also not stored. It is placed in large trash receptacles which are lined with plastic liners, and it is removed from the kitchen areas on a daily basis.

The area of the kitchen where the refuse containers are kept was inspected periodically by the Special Master and his assistants and consistently found to be clean and sanitary.

The final sanitation regulation is Ohio Department of Health Regulations 3701–21–04L which states:

All food shall be so stored, prepared, displayed, and served as to be reasonably protected from dust, flies, vermin, depredation, and pollution by rodents, poisonous insecticides, poisonous rodenticides, unnecessary handling, droplet infection, overhead leakage, and other contamination. No live animals or fowls shall be kept in any room in which food is prepared, served, or stored except guide dogs accompanied by blind guests. All practi-

---

**35.** It should be noted that this new procedure has resulted in a substantial loss of cups and spoons since, as with trays, those collecting them do not insist on receiving one from each inmate. They do, however, distribute one to every inmate at noon whether he returned one in the morning or not.

**36.** The Correction Center cleaning schedule and sanitary checklists are attached as Appendix 9.*

 * Available copy of Appendix 9 is illegible, and hence not reproduced.

cable means shall be used for the elimination of flies, roaches, vermin, and rodents.

All food which is stored in the Correction Center, whether in a refrigerator, freezer, or in a storage room, is stored so as to be off the floor and away from the walls. The storage areas, also, upon the several inspections made, have been found to be clean, neat, and sanitary. Therefore, the food, as stored, is reasonably protected from dust, flies, and vermin.

An extermination company has been contracted with by the Correction Center, and it comes into the kitchen every Monday and performs whatever fumigation is necessary. In addition, the Food Director uses a fogger every Thursday. With the use of these two operations, the Correction Center has been kept generally free of roaches, rodents, and other vermin.

Rule 6(b)(6) requires the kitchen and food service to be regularly inspected by the public health authorities and further requires that the recommendations or requirements of the inspecting authorities shall be implemented by the Sheriff within the time prescribed by the authorities.

Ohio Revised Code, Section 3732.05, requires restaurants (and thus the Correction Center) to be inspected at least annually. The former Special Master determined, however, that more frequent inspections of the Correction Center were required. Officials of the Toledo Board of Health also recommended inspections at least three times per year.

Inspections at the Correction Center, are, in fact, conducted three times per year. In the most recent two reports with respect to food sanitation conditions, public health authorities ordered a number of actions. The following chart indicates the substance of such requirements, the date of the order, and the degree of compliance by the Sheriff and his staff.

| NATURE OF ACTION REQUIRED | DATE OF HEALTH DEPT. ORDER | DEGREE OF COMPLIANCE |
|---|---|---|
| 1. Scrape and repaint wall area above warming carts. | 12-19-79 | Complete |
| 2. Clean dusty ceiling area above three vat sink. | 12-19-79 | Complete |
| 3. Thoroughly clean and routinely maintain hallway to rear kitchen door. | 12-19-79 | Complete |
| 4. Discontinue blockage of handsink with large containers. | 12-19-79 | Complete |
| 5. Reseal handsink to walls as needed. | 12-19-79 | Complete |
| 6. Thoroughly clean floor and fixtures in toilet room off hallway to rear kitchen door. | 12-19-79 | Complete |
| 7. Plastic utensils should be discarded after they become scratched or glaze wears off. | 12-19-79 | Complete |

| NATURE OF ACTION REQUIRED | DATE OF HEALTH DEPT. ORDER | DEGREE OF COMPLIANCE |
|---|---|---|
| 8. Discontinue leaving soiled eating utensils in hallways after meals; all utensils used on floors should be returned to kitchen as practicable. | 12-19-79 | Partial |
| 9. Remove shoes from food storage shelves in storeroom. | 12-19-79 | Complete |
| 10. Provide proper scoops with handles in place of serving bowls in flour storage bins. | 05-14-80 | Complete |
| 11. Provide approved type cleanable containers for transporting inmate cups and spoons in place of cardboard boxes. | 05-14-80 | Complete |
| 12. Clean steam table undershelf. | 05-14-80 | Complete |
| 13. Remove chemical deposits from interior of dishwasher. | 05-14-80 | Complete |
| 14. Remove debris from openings on upper levels of spray arm at dishwasher. | 05-14-80 | Complete |
| 15. Discontinue stocking uncovered trays of baked goods in "Delfield" freezer. | 05-14-80 | Complete |

■ Rule 6(c) requires all utensils, except the cup and spoon, to be returned to the kitchen promptly after each meal. As indicated by the noted health inspection reports, as well as in the report on sub-rule 6(b)(4), not all utensils, especially trays, are returned promptly to the kitchen. Dirty trays are constantly being found in the basement property area, the landing areas on each floor, as well as the service area.

This failure to return all dirty trays to the kitchen causes obvious sanitary problems. And, this is one area where there is no need for a problem to exist. A little more diligence and effort on the part of the Floor Supervisors, the officer in charge of collecting trays, and the trusties could eliminate this difficulty literally overnight.

■ Rule 6(d) requires all food or liquid dropped on the floor or table during meals to be cleaned up promptly afterwards. This is one of the areas that have improved dramatically during the terms of the present Master. Although from time to time, one will find food in the dayroom tables or module floors, on the whole, the Floor Supervisors have done a good job of requiring the inmates to clean up after each meal.

One final matter must be mentioned in connection with the food service operation at the Lucas County Correction Center.

Ohio Department of Health Regulation 3701–21–04 0(2) requires that "in food service operations hereafter constructed or extensively altered. There should be no direct opening between rooms where food is stored or prepared *or served* to the public, and rooms used for living or sleeping quarters" (emphasis added). This regulation was in effect when the Correction Center was constructed and obviously was ignored.

The food in the Correction Center is served in the module dayrooms where the inmates live, in direct contravention of the regulation. Further, it is not clear that serving food in the lobby areas of each floor would constitute compliance with the regulation given the direct opening between the lobby and the modules.

The only way to solve this problem is to construct or create a central dining facility. The Special Master finds it interesting that the health authorities have never brought this matter to the Sheriff's attention or otherwise required compliance with the above regulation. It is the Special Master's opinion that construction of a central dining facility is impracticable at this point in time. However, this violation must be noted and great pains must be taken to ensure that the modules and tables are cleared promptly after each meal, and further that *all* trays and utensils are returned to the kitchen for sanitation. Anything less will surely lead to the spread of vermin, infection, and disease throughout the Center.

## FINDINGS RELATING TO COMPLIANCE

It is the finding of the Special Master that the Defendants are in compliance with Rule 6(a) and also in compliance with Rule 6(b)(6) regarding health inspections. Substantial non-compliance, however, is found with respect to Rule 6(b)(1–5) in that nutritional standards are not met with regard to the actual serving of food, food is not served at proper temperatures, and the relevant health regulations are not being fully complied with.

The Special Master also finds substantial non-compliance with Rule 6(c) but finds substantial compliance with Rule 6(d).

It is hoped that the new system will solve most of these problems. However, in some instances, it is strictly up to the Sheriff and his staff to see that the applicable health regulations are enforced.

## RULE 7 MAIL

 In the First Report of the Special Master, it was determined that several problems existed with the mail delivery system. First of all, while it was found that no outgoing mail was opened or censored, and further found that there was no limitations on addressees, it was discovered that the written policy and procedure of the Correction Center were inconsistent with this practice. Second, it was found that no uniform procedure for ensuring that indigent prisoners received writing materials sufficient for five letters per week was in effect.

Both of these problems have been corrected.

The Policies and procedures of the Correction Center have been re-written. The policy states: "Inmates shall be allowed to send and receive mail [and] inmate's mail shall not be censored or read." The Special Master finds that this policy is effectuated by the Sheriff and his staff.

Incoming mail is delivered to main control on the first floor. From there, it is picked up by a member of the Inmate Service Department and transported to their office. It is then sorted by floor and bound. It is then delivered to the various floor counselors on the first shift who distribute the mail to the inmates. The counselors open all letters in the presence of the inmates to determine that no contraband is present. The letter is then given to the inmate. The letters are not read by the counselors.

The counselors who distribute the mail also carry with them sheets of paper and envelopes, and these are readily distributed to indigent inmates upon request. Inmates who are not indigent have ready access to writing materials through the commissary.

While distributing the mail, counselors also collect any outgoing mail that the inmates might have. In fact, inmates may give outgoing letters to an officer or counselor at any time. The outgoing mail is placed in a receptacle in the control booth on each floor, and at the end of each shift, the floor supervisor delivers it to the mail receptacle at main control on the first floor. The third shift main control supervisor sorts the mail into those requiring postage and those already stamped. Mail with proper postage is given to the mail carrier during the regular course of his route. Unstamped mail is delivered to the County Courthouse where proper postage is supplied. At no time has there been any indication that outgoing mail has been opened or censored. There also has been no evidence that unstamped mail has not been delivered to the Courthouse for postage.

With regard to parcels containing property, only those sent from non-local (i. e., more than fifty miles from the Correction Center) addresses are processed. Local residents must follow the appropriate procedures for personally delivering property to the Center.[37] Also, parcels containing perishable items or foodstuffs are not accepted. Accepted packages are delivered to the property officer who takes them to the floor where the inmate is housed. The parcel is opened in front of the inmate, checked thoroughly for contraband, and then given to the inmate.[38] The inmate is given a receipt for all articles received, and a record of these articles is also kept by the property officer.

### FINDINGS RELATING TO COMPLIANCE

Upon the several checks of the mail delivery system by the Special Master and his assistants, it was determined that the Defendants are in substantial compliance with Rule 7. There is no censorship of either incoming or outgoing mail; no limitation on to whom mail is sent; and sufficient writ-

ing materials and postage are available both to indigent and non-indigent inmates. Finally, the Correction Center's procedure regarding incoming parcel and packages in no way violates the provisions of this Rule.

### RULE 8 TELEPHONE USAGE

■ The First Report of the Special Master found the Defendants in non-compliance with the provisions of the original Court Order regarding telephone usage. He determined that inmates had access to telephones for only about six (6) hours per day and that additional telephone time could be allowed without interfering with the legitimate interests of the administration of the institution.

Thereafter, access to the telephones was expanded by the Defendants and the phones are now available to the inmates approximately twelve (12) hours per day.

The issue of telephone privileges of inmates must, however, be considered further because of a change in the type of phone service now available to the inmates.

When the Correction Center first opened, phones were located immediately outside of each module dayroom area. Inmates were allowed to use these phones for up to thirty (30) minutes per day and could make as many local calls as they wished within the time restraint. These calls were made on a direct basis with the expense for the calls being borne by the Defendant Commissioners.

The expense of these calls was apparently moderate until approximately July of 1978. At that time, the Public Utility Commission of Ohio authorized a new billing arrangement whereby Ohio Bell could charge the Commissioners on a "measured service" basis. It was determined by the Utility Commission and Ohio Bell that the jail facility was not a "residence" and, therefore, residential rates did not apply.

---

**37.** For a more extensive discussion of inmate property and the procedures regarding it, see Rule 28, *infra*.

**38.** If the inmate already possesses the allowed allotment of clothing property, the property is stored in the inmate's property bin.

Under this new billing procedure, the Commissioners were charged $590.80 per month as a monthly service charge, plus nine cents ($.09) per call. As a result, the monthly phone bill for the Correction Center rose from approximately $700.00 per month to approximately $3,500.00 per month, a 400% increase.

The Commissioners' first attempt at solving this problem was to try and obtain a residential exemption for the Correction Center. This, however, proved unsuccessful.

It was finally proposed by the Commissioners that Ohio Bell be allowed to replace the existing phone system with one whereby all calls made by inmates would be on a collect basis. Both local and long distance calls could be made by inmates but only if the receiving party would accept the charges for the call. And, while long distance charges would be the same as with any other phone system, the charge for a local call would be $.35, substantially more than one pays for a local call at a pay telephone.

The collect call system was proposed by the Defendants in November of 1979. The Special Master, after considering the various aspects of the problem, permitted the installation of the system, over the objections of the Plaintiff, in December of 1979.

While the Special Master is fully aware that cost is not a relevant consideration in determining the issue of constitutional rights, in no way have such rights of the inmates been violated by the new phone system. This is especially true in light of *Wolfish.* In certain situations (and this is one), there must be some material accommodations between institutional needs and objectives and prisoners' rights and privileges. The Special Master specifically finds that the motives of the Defendants behind the installation of this new phone service was not punitive, see, *Wolfish, supra* at 538, 99 S.Ct. at 1873; nor is it an unreasonable or exaggerated response to an otherwise

legitimate concern, *Id.*[39] The new phone system will save the county over forty thousand dollars per year, and while it is certainly somewhat more inconvenient for the inmates (as well as more costly for their families and friends), the inmates are not being denied access to the outside world.

It is important to note that even under the new system, inmates who do not have an attorney may make as many calls as necessary, on a direct basis, to obtain counsel. Also, counselors in the facility have the discretion to permit inmates with attorneys to call them on a direct basis from the counselor's office. While the counselors do not have to grant every such request, if they determine the matter to be serious, they can and do permit such calls.

## FINDINGS RELATING TO COMPLIANCE

It is the finding of the Special Master that the Defendants are in substantial compliance with Rule 8. Inmates are permitted thirty (30) minutes of telephone time per day and hours of access to the telephone are reasonable. Inmates without counsel are permitted a sufficient number of direct calls in order to obtain one. And, finally, the Special Master finds that the calls of inmates, whether to their attorneys or to anyone else, are not monitored.

## RULE 9 ATTORNEY–CLIENT FACILITIES

■ The First Report of the Special Master revealed substantial non-compliance with the Court's original Order regarding attorney-client booths. As a result of this finding, the Court, in its Order of July 29, 1977, ordered as follows:

FURTHER ORDERED, ADJUDGED, AND DECREED that the Defendants, their employees, agents, successors, assigns, and all those in active concert therewith are enjoined to:

---

**39.** In the only case the Special Master could find, decided since *Wolfish,* in which telephone privileges were specifically considered, the Court's order was for more restriction than that which is present here. See, *Epps v. Levine,* 484 F.Supp. 474, 477 (D.Md., 1980).

(i) Remove the dividing wall in each of the attorney/client booths as well as to provide soundproof doors, adequate ventilation in the booths, and such furnishings as are necessary for the attorney-client visits.

The present Special Master has reviewed the attorney-client booths on several occasions. His initial inspections of these revealed that the structural repairs ordered by the Court had been made. The dividing wall has been removed, and the booths also are now sufficiently illuminated, ventilated, and soundproof.

There are not, however on a regular basis, sufficient furnishings to accommodate four persons. This does not mean that additional chairs are not provided when more than one attorney visits an inmate. In fact, given the absence of complaints regarding the furnishings, it must be presumed that this is done.

Attorneys are also permitted to use the more commodious and brighter multi-purpose rooms for visiting with their clients. Given the heavy programming schedule of the Correction Center, however, these rooms are not always available.

There have been some questions raised about attorneys' access to inmates "at all reasonable hours." It is the policy of the Correction Center that attorneys are not permitted to visit their clients during the serving of meals, during shift changes, or after lock-up at night. The schedule for meals and shift-changes is as follows:

| MEALS: | Breakfast | 7:00 a.m to 8:30 a.m. |
| | Lunch | 11:45 a.m. to 12:30 p.m. |
| | Dinner | 4:45 p.m. to 5:30 p.m. |
| SHIFT CHANGE: | First Shift | 7:30 a.m. to 8:00 a.m. |
| | Second Shift | 3:30 p.m. to 4:00 p.m. |
| | Third Shift | 11:30 p.m. to 12:00 a.m. |

It is readily apparent from these schedules that from 3:30 p. m. to 5:30 p. m. there is only 45 minutes available for an attorney to visit his client, and there is no doubt that from time to time, attorneys will find this inconvenient. However, the Special Master does not find the Correction Center's policy unreasonable. There is still available, ample time during which an inmate and his attorney may meet.

### FINDINGS RELATING TO COMPLIANCE

It is the finding of the Special Master that the Defendants are in substantial compliance with Rule 9 in that adequate physical facilities for attorney-client conferences are available. They are sufficient in number, as well as properly illuminated, ventilated, and soundproofed. Finally, attorneys have access at all reasonable hours.

### RULE 10 HEATING AND VENTILATION

At the time of the First Report of the Special Master, the inmates had not spent a Winter in the new facility. Thus, while said report considered ventilation and air-conditioning problems, it did not address the issue of whether or not the heating system in the Correction Center is adequate.

During the term of the present Master, the inmates have spent two winters in the facility, and both have been wrought with substantial and numerous complaints about the heating system. Inmates and corrections officers alike complained frequently about the excessive cold in the building.

These complaints were brought to the attention of the Defendants on a regular basis. They, in turn, would refer the problem to the architects and engineers who designed the building and its heating system. And, for the better part of two years, these individuals were unable to resolve the problem.[40]

In a report from the architects dated February 20, 1978, it was indicated that the heating problems were the result of "negative building pressure" which resulted from a combination of wind and cold against the

---

**40.** It is somewhat interesting as well as disturbing to note that the architects and engineers were not at all reluctant to rely on the complexity of the size or the design of the building as an excuse for the heating problems. On more than one occasion, they indicated that there were bound to be problems inherent in a building of that size and design.

building in conjunction with the failure of the return fan to shutdown. An automatic return fan shutdown was recommended but not installed.[41] In an internal memorandum to the Sheriff from the maintenance department in January of 1979, it was indicated that the building again (one year after the architects' report on this problem) suffered from negative pressure, as well as from a lack of "fin and tube radiation." Additional radiation was installed, but this did not solve the problem of excessively cold temperatures in the Center.

The next information was received in May of 1979. At that time, the Commissioners were informed that the heating related problem in the Correction Center resulted from a deficiency in the amount of air being delivered to the rooms suffering from the cold, and that there were only forty-six (46) such rooms within the facility. The information proved to be inaccurate on both counts.

When the Winter of 1979–1980 began and the same complaints of cold temperatures resulting from cold air being supplied through the registers in the cells were heard, the matter was again brought to the attention of the Defendants. Further investigations of the heating system were made, and finally it was discovered that there was malfunctioning equipment within the heating system which appeared to be the source of the problem.

Apparently, for every six cells in the facility, there is (among other items of equipment) a "variable volume box" which controls the supply of cold air. These boxes have dampers on them which are supposed to open and close automatically as the system calls for cold air. However, the dampers on a number of these variable volume boxes were locking in the open position which resulted in a constant supply of cold air to the cells covered by that box. This explains why within one 12-cell module, six cells could be warm (the variable volume

box working properly) and six cells could be cold (the box malfunctioning.)

At a meeting held on January 29, 1980, the architects explained to the Special Master that the problem had been discovered. It was further explained that every variable volume box in the facility was checked and that seventeen were found to be badly malfunctioning. Assurances were given that all had been repaired and were in good working order. Further assurance was given that any additional problems with the system would be ones of control and adjustment and that the necessary adjustments could be made by the maintenance department.

Following this meeting, the complaints of cold temperatures in the cells were fewer. Upon inspections of the complaints by the Special Master and his assistants, it was determined that while in some cases the cells were cold, the constant flow of cold air into the cells had been eliminated.

Two final points must be discussed concerning the heating problems in the Correction Center. First, the system is controlled by a computer. At any given time, this computer will print-out a reading of the temperature in the various rooms and modules in the facility. The Special Master has found that the temperatures printed-out by the computer are consistently higher than the actual temperatures of the areas being considered. The maintenance department has investigated this, but indicates that the difference is only about three (3) degrees. Information supplied by corrections officers indicate that this difference might be greater. In any event, mere reliance on computer print-outs to confirm the adequacy of the heating system is unacceptable. Actual temperature checks from time to time, especially when complaints are received, are necessary in order to accurately monitor and control the heating system in the facility.

41. As will be discussed, the problem of negative building pressure did not turn out to be the major difficulty with the heating system. However, the architect acknowledges that the building is not designed to withstand severe, abnormally cold weather. Since the automatic return fan shutdown was recommended with this severe type of weather in mind, perhaps further thought should be given to its implementation.

Second, mention must be made of the fact that little interim relief was given to the inmates housed in cold cells. While the Sheriff did supply one extra blanket to these inmates, additional blankets or other articles of clothing were not provided despite repeated requests that he do so.

The ventilation and air-conditioning problems noted in the First Report of the Special Master appeared to have been corrected, and the Special Master finds the ventilation now to be adequate.

### FINDINGS RELATING TO COMPLIANCE

It is impossible to find that the Defendants have been in compliance with the provisions of this Rule, given the substantial heating problems which have existed over the past two winters. However, it does appear that perhaps the major source of the problem has been discovered and corrected. Close monitoring by the Special Master and/or the Jail Monitor during the upcoming winter months is necessary to ensure that the problem has been solved.

The Special Master does find the Defendants to be in substantial compliance with ventilation requirements of this Rule.

### RULE 11 HOT AND COLD WATER

■ This rule requires the Sheriff to provide hot and cold water for bathing, in accordance with the applicable Board of Health Housing Regulations, and also to provide working toilets and an adequate supply of drinking water.

The applicable Health Regulations appear to be Toledo Municipal Code Sections 10–3–5.101–2(b), (c), and 4(a) which state:

10–3–5.101–2(b) Each dwelling unit shall contain a room within the dwelling unit which affords privacy to a person within said room and which is equipped with a flush water closet and a lavatory basin, a bathtub or shower, properly connected to a water and sewer system approved by the Building Official.

10–3–5.101–2(c) Each kitchen sink, lavatory basin and bathtub or shower shall be properly connected with hot and cold water lines.

10–4–5.101–4(a) Each living unit shall be provided with potable water connected to the required fixtures.

As was explained in the First Report of the Master, each individual cell in the facility (save the two psychiatric cells in the booking area) has a sink and a toilet. In addition, each module has bathroom facilities which include a sink, toilet, and shower. In the First Report, the Special Master found lack of sufficient hot water in the Trusty Dormitory on the fifth floor. (In fact, at that time, there were no shower facilities in the dorm.) He also found a lack of hot water in the individual cells, malfunctioning water regulators in the module showers, and finally, found that the water from the shower was misdirected or flowed into the lavatory and dayroom areas.

A shower has now been installed in the Trusty Dormitory, and this problem has thus been corrected.

The other problems encountered in the Master's First Report, however, for the most part, still exist. The plumbing facilities in the Correction Center are a major source of concern. Each module is supposed to have a shower which provides sufficient hot water and works adequately so as to allow proper bathing. Each cell is supposed to have hot and cold running water and an operative toilet. In the several inspections of the plumbing in the Center, only the toilets have been consistently found to be in proper working order.[42] Without question, a cell in which there is not only an operative toilet but also *both* hot and cold running water is the exception and not the *norm*.

In an inspection of the plumbing throughout the facility conducted by the Special Master and his assistants in January and

---

**42.** If a toilet is found to be out of order, the maintenance department does a good job of promptly repairing it.

February of 1980, the following were the most frequently discovered problems:

A. Water from showers would not stay on without constant pressure on the button.

B. No hot water in the cells.

C. No cold water in the cells.

D. No hot water or only luke-warm water in the showers.

E. Clogged or very slowly draining sinks.

F. Minimal water pressure in sinks.

G. Misdirected water from the showers.

The plumbing problems were brought to the Defendants' attention and repairs have begun. New shower fixtures are being installed and levers have been put in to allow the shower to be operated by the guards from the janitorial closets. Thus, the water stays on the entire time the inmate showers without him or her having to constantly press the water regulator button. This also gives the water an opportunity to warm-up since it runs continuously. The new shower heads have also helped to somewhat alleviate the problem of water running into the lavatory and dayrooms although the problem has not been eliminated.

The major difficulty with the repairs is that they are proceeding very slowly. In the several months that this project has been underway, only the sixth floor and part of the fourth floor have been completed. Thus, the above mentioned problems continue to exist in the other modules.

The cold water which runs from the tap in the sink in each cell is potable. The problem, however, as mentioned above, is that it is not uncommon to find the cold water tap in the cells inoperative or to find the water running with minimal pressure. The lack of hot water in the sinks appears to result from the fact that the regulator buttons do not permit the water to run sufficiently long enough to warm-up. Even the showers, which are closer to the source of the hot water than are the sinks, take an unusually long time to heat up.

The Special Master has found no evidence that an inmate has been incarcerated in a cell that did not have a working toilet. The psychiatric cells in the booking area which do not have toilets have not been used.

## FINDINGS RELATING TO COMPLIANCE

It is the finding of the Special Master that the Defendants are in a state of non-compliance with Rule 11 in that an adequate supply of water for bathing is not consistently provided nor are the sinks in the individual cells consistently able to provide both cold and hot water.

The Special Master does find the Defendants to be in compliance with the requirements of having adequately working toilets and with the requirement of not housing an inmate in a cell without a working toilet.

Finally, the Special Master finds the cold water in the cells to be potable.

## RULE 12 LIBRARY SERVICES

At the time of the filing of the First Report of the Special Master, the transfer to the new facility had been effectuated. However, the spacious, new library facilities in the Correction Center were not then being used. The Special Master found that, while use of a book cart system had constituted a good faith effort to comply with the library provisions of the Court's Order in the old jail, use of such a cart was insufficient in the new facility.

The Special Master, in his First Report, also found that books and periodicals delivered to inmates, other than through the library system, were being unduly censored. Finally, he determined that the new library should contain adequate legal materials, but did not.

Under the new Rules, *all* inmates are entitled to ninety (90) minutes of library time per week. Inmates, whom the classification team determines for security reasons should not visit the library, have their library privileges satisfied by the use of a book cart.

The present scheduling of library time in the Correction Center is as follows:

| Monday | Module | Minutes |
|---|---|---|
| 8:30 a.m. to 10:00 a.m. | 4/SW/4SE | 90 |
| 10:00 a.m. to 11:30 a.m. | 4/NE/4NW | 90 |
| 12:30 p.m. to 2:00 p.m. | 3NE/3NW | 90 |
| 2:00 p.m. to 3:30 p.m. | 3SW/3E/2Med | 90 |
| **Wednesday** | | |
| 8:30 a.m. to 10:00 a.m. | 6ND/6E/6W | 90 |
| 10:00 a.m. to 11:20 a.m. | 6NA/6NB/6NC | 80 |
| 12:30 p.m. to 2:00 p.m. | 3SE/3W | 90 |
| 2:00 p.m. to 3:40 p.m. | 5NE/5NW/5E(t) | 100 |
| **Thursday** | | |
| 8:30 a.m. to 10:00 a.m. | 5SE/5SW | 90 |
| 10:00 a.m. to 11:30 a.m. | 4E/4W/5W/2Med | 90 |
| 12:30 p.m. to 2:00 p.m. | 6SA/6SB | 90 |
| 2:00 p.m. to 3:30 p.m. | 6SC/6SD | 90 |

The only obvious discrepancy of this schedule [43] with the Rule is that only 80 minutes is scheduled for the six north module on Wednesday morning. This, however, is easily correctible. Also, this schedule, which became effective in April of 1980, has proven to be far more effective in ensuring that the kitchen trusties receive their library time. There had been some difficulty getting the trusties to the library previous to this schedule.

There are now in excess of 9000 volumes in the general library collection at the Lucas County Correction Center.[44] In addition, there are 250 tapes which inmates may play on cassette players while visiting the library. The tapes may not be removed. However, each inmate may check-out up to five (5) books and five (5) periodicals during each library period. These materials must then be returned during the inmate's next visit to the library. Inmates who do not return materials in a timely fashion are not permitted to obtain further materials.

Other than the fact that they can not smoke in the library, (a rule which applies to Corrections Officers as well) no complaints from inmates concerning library services have been received.

The Special Master found in his initial report that the Defendants were not complying with censorship provisions of the Court's Order. That Order indicated that only books or periodicals which clearly fell within the definition of pornography as established by the United States Supreme Court would be censored. This turned out to be a very difficult standard for the Corrections Officials to apply. It was therefore determined that there would be no censorship of incoming books or periodicals. This change is reflected in the Rules, and the Special Master has found no indication that books or periodicals supplied to inmates, from whatever source, are being censored.

At the time of the First Report, the Correction Librarian had received a list of needed legal materials from the Law Librarian of the University of Toledo College of Law.[45] When grant funds proved to be unavailable to purchase these materials, the Defendant Commissioners agreed to defer the cost, and the materials were ordered. These materials were not actually present in the facility, however, until March of 1980.

While plans have been made to create a separate legal section of the library, this has not as yet been done. The reason, according to the Correction Librarian, is that no one on the library staff is sufficiently trained in legal research to allow adequate control of the books and assistance to the inmates. It must also be pointed out that while sufficient time in the schedule has been set aside for legal research for the inmates, this scheduled time is not yet being utilized. So, while inmates are allowed to use the legal materials (they may not be removed from the library) during regular library hours, the required blocks of time necessary for effective research are not available. It has been indicated that the Defendants are going to utilize law students as legal interns to assist the inmates with their research and that

---

**43.** It should be noted that this is the general library schedule. Law Library time will be discussed *infra.*

**44.** See, the Report of the Toledo-Lucas County Public Library Services to Correction Facilities, March, 1979.

**45.** This list is attached as Appendix 10.*

 * Available copy of appendix 10 is illegible, and hence not reproduced.

legal research time will be available once these students are hired. Whether these students are hired or not, however, the research time must be made available.

### FINDINGS RELATING TO COMPLIANCE

It is the finding of the Special Master that the Defendants are in compliance with Rule 12(a) and Rule 12(b) in that there is no censorship of books and periodicals, and that sufficient library time is being made available to the inmates.

It is also the finding of the Special Master that, while an adequate law library exists, Rule 12(b)(3) requiring sufficient time for legal research, is not being complied with by the Defendants.

### RULE 13 FOOD PURCHASE

■ This Rule requires the County Purchase Department to order all food and supplies requested by the Director of Food Services. A handwritten food order is prepared by the Director every Wednesday. This order is typed on a purchase requisition form and is sent to the County Purchase Department. Bids are then taken on the requested items, the lowest price selected, and the food ordered. The food is delivered to the kitchen on the following Saturday or Monday. There is a somewhat greater time lag in the delivery of ordered supplies. However, the delay has not proved to be a serious detriment to the kitchen staff.

Monitoring of the purchase requisition forms over the last year indicates few instances where the food ordered by the Food Services Director has not actually been purchased. In each instance, the County Purchase Department would contact the Food Director and obtain his approval before deleting an item from the list. This, of course, is an acceptable procedure.

Mention must be made of the fact that with the installation of the new food services system, the purchasing will no longer be done by the County. As part of its contract, Szabo has been given complete control over all purchasing. It is their position that this will save the County money in the long-run. In any event, once the new system is installed and if it proves to be effective, this Rule should be modified to permit food purchasing directly by those operating the kitchen in the Correction Center without the necessity of going through the County.

### FINDINGS RELATING TO COMPLIANCE

It is the finding of the Special Master that the Defendants are in substantial compliance with Rule 13 in that all food and supplies are purchased through the County Purchasing Department and that all items requested by the Director of Food Services are, in fact, ordered. It is the further finding of the Special Master that should the new food service system be installed and proven effective, this Rule should be modified to permit direct purchasing by the Center kitchen.

### RULE 14 MEDICAL SERVICES

■ The medical services which are provided at the Lucas County Correction Center have undergone significant change since the First Report of the Special Master. At that time, two physicians were under contract to the County, one full-time and one part-time, and they, along with the nursing staff, performed whatever medical services were rendered to the inmates.

In his First Report, the Special Master found a number of defects in the medical services at the Correction Center. These included the fact that the doctor did not spend sufficient time in the facility, that the physical examination did not comply with the Court Order, that not all inmates received physicals, that there were no provisions for medical diets, and that there was insufficient control over the dispensing of medications.

The former Special Master, in an effort to correct the situation, entered into negotiations and discussions with Leroy A. Rodgers, M.D., of the Department of Family Medicine of the Medical College of Ohio, in

the hope of establishing a new medical program under Dr. Rodgers' direction. Many of the details of this program had been worked out at the time the present Special Master assumed his duties. After the change in Special Masters, the final details were resolved, and in January of 1979, the Defendant Commissioners contracted with Dr. Rodgers to provide medical services to the Correction Center.

The contract basically requires Dr. Rodgers to provide medical services to the Correction Center in accordance with the A.M.A. Standards for Accreditation of Medical Care and Health Services in Jails, as well as the provisions of the original Order of the Court, as amended.

The actual medical services are administered, under the direction and supervision of Dr. Rodgers, by a group of residents in the Department of Family Medicine of the Medical College of Ohio. A doctor is in the facility to conduct sick call, as well as to administer physical examinations, Monday through Friday commencing at 6:00 p. m. In addition, a doctor is available on-call twenty-four (24) hours per day, seven (7) days per week.

After administering the program for several months, Dr. Rodgers and his staff determined that some of the requirements of the original Court Order could be deleted or modified without reducing, in any way, the quality of medical services being provided to the inmates. Changes in the Order were proposed to the Special Master, discussions ensued, and the results are reflected in the terms of this Rule. Thus, it was agreed that the level of medical care services shall be such as to "detect and ameliorate any acute illness or exacerbation of an existing of chronic illness."

In order to effectuate the above standard, inmates are given two (2) physical examinations: an initial screening exam given within seventy-two (72) hours of admission sufficient to detect any severe health threats to the Center; and a more detailed, thorough examination administered within seven (7) days of admission and sufficient to identify the inmate's existing health problems.

The medical services program in the Correction Center can be labeled an unqualified success. Dr. Rodgers and his staff have made a number of significant changes in the administration of medical care. Among these are the availability of first-aid kits on each floor; the use of a screening form in the receiving and booking area which assists the doctors in their initial examination of inmates; the availability of a nurse to make rounds in the booking area at least once per shift; the inclusion of work release inmates in the medical program; and the purchase of a microscope for in-house use. The new program has also resulted in fewer hospitalizations of inmates and perhaps most significantly of all, the amount of medication dispensed has been drastically cut. The Medical Director estimates that the use of medication has been reduced by 1000%. All medicines are prescribed by the treating physician, and the ingestion of medicine is always done in the presence of either a physician or a nurse.

The quality of the medical program is reflected in the fact that in June of 1979, the program was accredited by the American Medical Association. In a letter to the Sheriff from the Ohio State Medical Association, it was stated:

Dear Sheriff Hickey:

The Ohio State Medical Association is pleased to inform you that the Lucas County Correctional Center's medical care and health services have been awarded full two year accreditation by the American Medical Association. Only sixty (60) facilities in the United States have received an AMA Accreditation Award.

As you are aware, Leroy Rogers, [sic] M.D., David Michaels, L.P.A., and Rosemary Alt, R.N. have worked diligently over the past six months to upgrade the medical services provided by the jail. The Lucas County Correctional Center becomes one of only four Ohio jails who have been formally accredited by the AMA. An accreditation award indicates the jail has met nationally recognized

medical care and health service standards.

A formal presentation of the accreditation certificate will be made at a news conference in Toledo once the official announcement is made by the AMA. Please don't hesitate to contact us if we can be of service.

Sincerely,

Richard Ayish Michael Zellers
Pilot Project Director Associate Project Director

There are only two areas where difficulties persist in the medical program. One, which has nothing to do with the level of care, concerns the billing of third party carriers by the medical department for services rendered in the facility. It was the hope of the Medical Director that a significant number of inmates booked into the facility would have medical insurance of some sort: either private benefits such as Blue Cross—Blue Shield or public assistance benefits of one sort or another. An effective procedure for obtaining third party identification numbers from among the personal effects of the inmates, however, has not yet been achieved.

Rule 14(d) states that "arrangements must be made to meet the needs of inmates with special medical problems." And, while inmates who are in need of x-rays, laboratory tests, hospitalization, or some other form of special medical treatment, receive it, those inmates who are in need of psychological or psychiatric care, are not receiving appropriate treatment. The inability to secure adequate psychiatric care has been one of the most frustrating aspects of this entire litigation.

However, there does appear to be some hope for the future. First of all, since approximately September of 1979, the Court Diagnostic and Treatment Center has been providing crisis intervention counseling. In its grant proposal for crisis intervention services, the Diagnostic and Treatment Center indicated:

Changes in the population of the Lucas County Correctional Center dictate the need for trained mental health practitioners involved with and available to jail personnel. Because a huge volume of psychotropic medication is dispensed at the jail, there is some obvious need for psychiatric consultation solely for the management of behavior on a chemical level. Additionally, a trained psychiatric nurse practitioner is needed to monitor and provide nursing care for these people. However, there are many crisis situations that result from behavioral problems directly connected with stress-related disturbances caused by incarceration, by poor coping skills in psychologically disturbed individuals, by active psychosis, by self-destructive thinking and behavior, and by manipulation. These mental health problems do occur at all points in the incarceration process, from intake to release, and for a fairly broad range of offenses. These present problems to the jail medical staff, to the classification staff, to the corrections officers, and to the counseling staff. The jail staff varies greatly in their training and ability to manage these kinds of mental health crises. Often these clients consume an inordinate amount of staff energy and time.[46]

While the services rendered by the Treatment Center do not resolve the need for a psychiatrist or psychiatric nurse, they have been useful in helping to diffuse difficulties which arise in the facility during normal working hours. The Treatment Center has also made its staff available for consultation in specific cases with the Correction Center staff and has also been involved in training projects to better educate the Correction staff concerning mental health problems.

The need for the services of a psychiatrist at the Lucas County Correction Center are obvious. In a study done by the Court Diagnostic and Treatment Center in connection with its Crisis Intervention grant

46. See, Grant Proposal, *Crisis Intervention Services to Lucas County Correction Center,* Court Diagnostic and Treatment Center (1979).

proposal, it was discovered that "of the 240 beds in the Lucas County Correction Center (LCCC), 40 are occupied by individuals on psychotropic medications. [And], an additional 25 to 35 have long histories of mental illness. The medical section's 12 beds are constantly filled with psychiatric problems." [47]

Efforts are being made along two lines in a further attempt to solve this problem. First, the Medical Director is conducting negotiations with the Department of Health, Education and Welfare [48] in the hope of obtaining the services of a psychiatrist at the Correction Center through the National Health Services Corporation. This would require the designation of the Toledo area and, in particular, the Correction Center as a health manpower shortage area for this specialty of medicine.

Along another line, the Medical Director, in conjunction with the Special Master, has been discussing the feasibility of a private psychiatric clinic providing services to the Correction Center. The outlook is brighter than it has been in some time that, before too long, psychiatric services will be available to the inmates of the Correction Center.

Finally, with regard to medical services, it should be noted that when the new program began, a number of complaints from inmates was received indicating that their requests to go on sick call were not being honored. Investigation by the Special Master revealed an inadequate procedure by which inmates could make such requests. Discussions were held which led to the formulation of a new sick call procedure. This procedure has been codified in Rule 14(k). Since its inception, the complaints from inmates have diminished.

## FINDINGS RELATING TO COMPLIANCE

It is the finding of the Special Master that the Defendants are in substantial compliance with Rule 14(a), (b), and (c), in that the medical care in the Correction Center is at an acceptable level, that appropriate physical examinations are given to all inmates, and that sick call is held and attended by a licensed physician. It is the further finding of the Special Master that inmates with special medical problems resulting from physical ailments are having these needs met. However, psychiatric services are needed in order to meet the special needs of inmates suffering from psychological and psychiatric maladies. Finally, the Special Master finds the Defendants in substantial compliance with Rule 14(d) through Rule 14(k) in that adequate facilities are available, a physician is on call at all times, the part-time services of a dentist are available, medicines are prescribed and dispensed appropriately, and an adequate sick call procedure is being maintained.

## RULE 15 GRIEVANCE PROCEDURE

The Special Master, in his First Report, found the Defendants to be in substantial non-compliance with the provisions of the Court's Order of May 8, 1974 which concerned the filing of written grievances by inmates. The Special Master determined that inmates were not being freely provided with forms on which to file their offense reports. He also found that the Corrections Administrator was not regularly receiving a copy of the offense reports nor were inmates receiving a stamped envelope in which to mail a copy of this report to their attorney. The Special Master also determined that inmates' offense reports were not promptly or thoroughly investigated. Finally, a finding was made that neither the Sheriff's staff nor the inmates were given a copy of the grievance procedure.

The grievance procedure has been fraught with difficulty and confusion. At one of the first meetings held by the present Special Master, it was learned that the Sheriff's staff was totally unfamiliar with the Court's Order of May 8, 1974. In fact, one staff member remarked that he

---

47. *Id.*

48. Now the Department of Health and Human Services.

was seeing that Order for the first time at that meeting.

The difficulty in establishing an effective grievance procedure appears to arise from several related causes. First is the obvious reluctance, or at least ambivalence, of the Correction Center staff to assist inmates in the preparation and filing of grievances in which members of the staff are named as perpetrators of the offense. Second, the Center staff is obviously less than enthusiastic about investigating the conduct of one of their own. And finally, there is a natural tendency on the part of the Center's staff to protect itself from false or unjust accusations.

At the time an inmate is admitted to the general population, he is interviewed by a member of the classification team. As part of this interview, he is advised of the fact that inmate offense report forms are available, and the purpose of these forms is generally outlined. The inmate, however, is not provided with a copy of the grievance procedure. Since Rule 15(i) specifically requires that inmates be provided with such a copy, it was agreed among all parties that an "Inmate Handbook" which, among other things, would contain the entire grievance procedure, would be drafted, printed, and distributed to each inmate at the time of their admission to the general population.[49] Also, to ensure that all inmates are aware of their right to file offense reports, the grievance procedure will be posted, in permanent form, throughout the booking area of the Correction Center.[50]

While the Correction Officers rarely assist inmates in the completion of the offense reports, counselors do lend such assistance. Normally, a counselor will talk to the inmate and discuss the problem in hopes of resolving it without the necessity of filing a report. However, if the inmate persists in his desire, the counselor provides the form and, if required, helps the inmate fill it out.

The form, itself, is adequate. It provides space for the inmate's name, the date and time of the offense, the name or names of the people allegedly committing the offense, and sufficient space for the inmate to detail the nature of the offense.

The Special Master has received very few complaints from inmates indicating that they have had difficulty obtaining the grievance form. However, these forms are provided almost exclusively by counselors rather than Corrections Officers. Thus, there is bound to be some delay as the inmate waits for the counselor to make his or her appointed rounds. There is no reason why these forms could not be made available by the Corrections Officers.

Inmates are permitted to fill the offense reports out themselves or with the help of another person of the inmate's choosing. There have been no indications to the Special Master of inmates being harassed while attempting to fill out a report. Inmates are segregated, upon their request, in order to complete their reports privately, should the situation so dictate. Also, no signature, other than the inmate's, is required to make the offense report official.

Inmates retain one copy of their report and one is filed with a representative of the Sheriff (Administrative Assistant.) However, inmates are not provided with a stamped envelope in which to mail a copy of their grievance to their attorney nor is a copy of the report regularly sent to the Corrections Administrator.

Inmates who file offense reports which allege facts which, if true, would constitute criminal offenses, are allowed to discuss their report with a prosecuting attorney. While the procedure previously was to have the inmate transported to the prosecutor's office by 9:00 a. m. of the business day next succeeding the commission of the offense, this proved to be cumbersome, time-consuming, and ineffective. At the present time, a member of the prosecutor's staff

---

**49.** A copy of the Inmate Handbook is attached as Appendix 11.*

 * Available copy of Appendix 11 is illegible, and hence not reproduced.

**50.** Since inmates in booking may never end-up in the general population, they would not receive the Inmate Handbook.

comes to the Correction Center and interviews the inmate. If the inmate choses to file charges, he is permitted to do so.

There is no question that at one time the Sheriff's Department attempted to discourage the filing of criminal charges by inmates. In a letter dated December 21, 1979 from the Sheriff's Administrative Assistant to an inmate in response to an offense report, it was stated:

> ... Furthermore, you are hereby placed on notice that if you choose to pursue assault charges and a thorough investigation reveals that your claim of assault is utterly without any basis, then this Department will consider filing falsification charges against you in Court.

In a follow-up letter dated December 26, 1979 concerning this matter, the Administrative Assistant indicated:

> In view of the time, money and manpower employed in such investigations, utterly false complaints which are filed, that is, those having absolutely no basis in fact or law, will not be tolerated. It is therefore the policy of this Department to advise all complainants that the filing of false complaints can result in a serious personal penalty.

While the Administrative Assistant indicated in the latter letter that it was not "the intent or desire of the Lucas County Sheriff's Department to intimidate or 'scare' inmates" out of filing offense reports or criminal charges, it was clear to the Special Master that letters such as those above would have exactly that effect. The Special Master brought the matter to the attention of the Sheriff through his attorneys, and indicated that responses to offense reports such as the one quoted above would not be tolerated. Since that time, no similar responses have been sent to inmates nor is there any indication that they have otherwise been discouraged from filing charges with the Prosecutor's Office.

Inmate offense reports are not promptly investigated by the Sheriff or the Corrections Administrator. The current procedure is for a counselor to investigate an offense. This usually entails the counselor talking to the inmate and to the Corrections Officer involved if he or she is available. The counselor then files a "Counselor's Response to Inmate Offense Report." This usually ends the investigation. The response to the report filed by the Administrative Assistant usually follows the recommendation of the counselor if there is one (often there is not because the counselor was not able to obtain all of the facts.)

In a memorandum to the Special Master (among others) dated October 29, 1979, the Administrative Assistant proposed several changes in the grievance procedure. What, in effect, he was requesting was a change in the written procedures to more accurately reflect what was in practice. The memorandum stated:

> ... The use of an Inmate Offense Report to express a general complaint appears to have *created the impression among some officers and staff members that they will be investigated by the Internal Affairs Bureau or a supervisor if they are named in connection with the complaint. For purposes of eliminating this confusion and to facilitate the proper handling of all inmate complaints the following is proposed* : (emphasis added)
>
> 1. Creation of a new form for handling all inmate general complaints. This form could be titled *Inmate Action Form* with a printed instruction of the form indicating its purpose as a general complaint form for reporting complaints about staff, service, denial of visitation or phone call, etc.
>
> 2. The *Inmate Action Form* or whatever name it is given would be obtained from the counselor who as now would assist the inmate in filling out the form if necessary.
>
> 3. The counselor as is the current practice would then investigate the complaint and submit a written response noting findings of fact and what they did to resolve the complaint. The majority of complaints currently received from inmates should conceivably be able to be resolved at this level. Only after a thorough investigation by

the counselor should a complaint that is of a more serious nature and not resolvable be submitted to a supervisor for resolution, i. e., a proven theft of property, not a suspected one, threat of or excessive use of force by an officer or staff person, etc.

While the Administrative Assistant wishes to give the offense report a new name, everything else in this proposal reflects current practice. However, the confusion lies with the Administrative Assistant. In fact, staff members ought to be investigated by Internal Affairs or a supervisor (or both) when named in an offense report. This would then constitute "proper handling of all inmate complaints." It is true that many inmate complaints can be resolved by the counselor. It is equally true, however, that many can not be so resolved. When such a case arises, further investigation should be conducted. Instead, complaints not resolved by the counseling staff are generally ignored.

There is some exception to the above stated policy. When an inmate alleges that he has been physically abused by a Corrections Officer, Internal Affairs is called upon to investigate. And, the level and quality of these investigations have improved substantially since the initial Report of the Special Master. At that time, it appeared that the Sheriff's staff merely assumed that any such allegations of an inmate were false. However, when four Correction Officers were tried and convicted [51] of assaulting an inmate, the Center staff appeared to re-examine their position. They decided that if there was merit to the inmates' allegations of this nature, it was in their own best interest to thoroughly investigate. Such investigations protect both the inmates and the Sheriff's Department.

Finally, in regard to the grievance procedure, it should be noted that sub-rule 15(h) provides that an inmate may appeal the decision concerning his offense report to the Court of Common Pleas. This rule was added to serve a two-fold purpose: first, it is hoped that it will improve the investiga-

tion process. It may very well be that in order to avoid an appeal to the Common Pleas Court, the investigation process at the Sheriff's Department level will improve. Additionally, the Court, most likely through the Jail Monitor, will be able to investigate grievances which come to it. Second, by allowing appeals to the Court, an air of objectivity, previously missing, is added to the entire grievance procedure. It is now possible for someone outside of the Sheriff's Department to look into the facts of a grievance. This, of course, innures to the benefit of not only the inmates but also the Center staff as well.

## FINDINGS RELATING TO COMPLIANCE

It is the finding of the Special Master that the Defendants are in compliance with Rule 15(a) and (b). Inmates are advised of the grievance procedure, are given the required assistance, and the forms on which the reports are made are adequate.

The Defendants further are in substantial compliance with Rule 15(c) and (d). The inmates are permitted to fill out the report without interference from anyone, and no signature, other than the inmate's is required.

The Defendants are not in compliance with Rule 15(e) in that stamped envelopes for mailing copies to attorneys are not provided nor is a copy of the offense report regularly filed with the Corrections Administrator.

The Defendants are in substantial compliance with Rule 15(f). Inmates are permitted to discuss appropriate offense reports with the prosecutor and, at the present time, neither the Sheriff, nor his agents, are attempting to discourage the filing of criminal charges by inmates.

It is the finding of the Special Master that the Defendants are not in compliance with Rule 15(g) in that offense reports are not promptly or thoroughly investigated by the Sheriff or the Corrections Administra-

---

**51.** The convictions were later reversed on appeal.

tor. However, that portion of the sub-rule requiring inmates to receive necessary medical attention is being adhered to by the Defendants.

Regarding Rule 15(h) and 15(i), the Special Master finds that appeals of inmate offense reports to Corrections Administrators are allowed but no appeals to the Common Pleas Court are yet occurring. Also, the inmates are not being provided with a copy of the grievance procedure, but this should be rectified with the distributions of the "Inmate's Handbook."

## RULE 16 CLASSIFICATION

In his First Report, the Special Master determined that the programs which were mandated by paragraph seventeen (17) of the Court's original Order would be possible to establish in the new Correction Center but only if a much more sophisticated system of classification and intake diagnosis was developed. He found that the classification system in effect at that time basically ignored the educational, employment, religious, and family needs of the inmates.[52] The Special Master in conjunction with the parties thus took on the task of developing a new classification system.

As was indicated in the introduction, most of the work on the classification system had been completed by the time of the change in Special Masters. A series of meetings were held by the new Special Master to iron out the final details, and once the input and approval of the Medical Director was received, the system was complete. The result of these efforts is Rule 16 which sets forth the entire classification procedure.

The Special Master did have the opportunity of sitting in on a Classification Team meeting wherein initial classifications are made, and reclassification of either housing assignments or custody levels are considered as are other special needs or circumstances of particular inmates, e. g., should an inmate be made a Trusty.

At the classification meetings, the Intake Counselor provides all pertinent information concerning the inmate to the Team. This information has been gathered during an initial intake interview. The report of this interviewer is reduced to writing and includes *at least* the following information:

a. Name

b. Age, Race, Sex, Religion

c. Charge

d. Legal Status

e. Prior Experience in the Criminal Justice System

f. Educational History and Interests

g. Employment History and Vocational Goal

h. Living Situation at Time of Arrest

i. Family/Social History

j. Mental Health History

k. Medical Problems (if any)

l. Drug or Alcohol Involvement

m. Assessment of Inmate's Counseling and Module Adjustment Needs

n. Assessment of the Inmate's Interest in and Need for Center Programs and Services

The Intake Counselor expresses his or her impressions of the subject inmate as do the other members of the team if they know the individual from prior contact in the Center.

At the meeting attended by the Special Master, most emphasis was placed on the physical stature of the inmate (height and weight); prior penitentiary and county jail experience; educational background and intelligence level (based on impressions of the Intake Counselor); as well as the relative emotional stability of the inmate.

Once all of the input is received, the inmate is assigned to a custody level (at the meeting attended by the Special Master, all inmates were assigned to Pre-Trial Medium.) Once this is accomplished, housing for

---

**52.** The former Master did find that such needs were considered for female inmates by the

Women Offender Services Bureau.

the inmate is then assigned. The Classification Team attempts to keep the housing modules as homogeneous as possible based on custody levels. A concerted effort is also made to keep the modules racially balanced. Finally, the counseling, educational, and treatment services needed by the inmate are also considered when making a housing assignment. In fact, once the housing assignment is made, a specific counselor is assigned to that inmate.

Reclassifications are also considered at each team meeting. An inmate may have his custody level or his housing, or both, changed by the Classification Team when it is deemed appropriate because of the behavior of the inmate within a particular module. At the meeting of the Classification Team attended by the Special Master, several inmates had their housing changed because they had been acting out, agitating other inmates, or because cliques had formed within a module, and the Classification Team desired to break-up the clique.

Finally, at each team meeting, the Classification Team is to review the situation of any inmate classified to administrative isolation to determine whether reclassification or perhaps an expansion of privileges is possible. This was also done by the Classification Team at the meeting attended by the Special Master.

## FINDINGS RELATING TO COMPLIANCE

The above represents a broad review of the classification procedure. The Special Master finds it unnecessary to review each sub-part of this rule in detail. The Special Master is satisfied that the intent of the original Court Order is being adhered to in the new classification procedure, and the Special Master further finds that the Defendants are in substantial compliance with Rule 16.

## RULE 17 WORK RELEASE

Rule 17 originally was drafted to provide for a Work Release program. When it was later discovered that an existing Common Pleas Court Rule concerning Work Release was already in effect, it was agreed that Rule 17 would be deleted.

## RULE 18 COUNSELING

At the time of the filing of the First Report of the Special Master, there were only three counselors employed by the Sheriff's Department. Both the Special Master and the Defendants realized that such a staff was totally inadequate to support the type of counseling envisioned by the Court Order. In May of 1977, a stipulation was reached whereby the Defendants agreed to hire sufficient counselors to have one available on each of the housing floors during shifts one and two and further to have one counselor available to do crisis intervention work on the third shift.

While the counselors agreed to in the May, 1977 stipulation had not yet been hired, at the time of the writing of the Special Master's First Report, they, of course, have now been hired, and, in fact, the counseling staff at the Correction Center now exceeds twenty.

As was mentioned in the report on classification, every inmate classified into the Center is assigned to a specific counselor. It is this counselor's duty to contact the inmate within 24 hours, ensure that the inmate is aware that he/she has an assigned counselor, process any requests of the inmate, and make note of any fear, apprehension, or other emotional problems which the inmate may be experiencing.

The assigned counselor must then hold a private conference with the inmate within five days of his/her classification. The purpose of this interview is to again evaluate the inmate's demeanor, attitude, emotional stability, as well as the inmate's adjustment to life in the Correction Center. During the initial conference, the counselor is also to discover any family or friends who may be significant to the inmate and further should identify the inmate's plans for re-entry into the community, should that appear to be imminent. Based on the information provided in this initial conference, the Counselor must develop a counseling plan which

defines those areas which will be emphasized by the counselor in work with that particular inmate.

In addition to the duties a counselor has with respect to those inmates to whom he or she is assigned, a counselor also has certain duties as a "floor" counselor. As a floor counselor, a counselor must make rounds to each module during his or her shift to determine if any of the inmates on that floor, whether assigned to that counselor or not, have any special needs or requests. The floor counselor must then attempt to solve the requests of the inmates as soon as possible. In addition, a number of very specific duties are required of the floor counselors. These include assisting inmates with grievances, preparing the worship service signup sheet, holding module meetings, arranging out of Center transportation, observing shakedowns, acquiring hygiene products for the inmates, and even making the arrangements for an inmate to get married.

While the counseling staff of the Correction Center does an admirable and competent job of performing the functions and duties outlined above, very little clinical therapy actually occurs in the Center. While the Court Diagnostic and Treatment Center does provide crisis intervention counseling and further has been willing to provide some informal consultations with regard to particular inmates, the vast majority of inmates receive no psychological intervention. The counseling staff at the Center simply is not equipped to deal with the very severe emotional and psychological problems experienced by some of the inmates. It is hoped that if psychological services for the Correction Center can be arranged, the efforts of the counseling staff can be made all the more effective.

Group counseling in the Correction Center basically takes the form of drug and alcohol rehabilitation counseling. Inmates are advised at the time of their initial conference with their assigned counselor of the availability of drug and alcohol counseling. If the inmate expresses an interest, he or she then fills out an application which is then processed. Such group sessions are held at least on a weekly basis. Very little formal group counseling is done by the counseling staff of the Center. While the policy and procedures provide for such counseling, it appears that the individual caseloads of the counselors simply do not permit them to take on the additional burden of formal group counseling.

## FINDINGS RELATING TO COMPLIANCE

It is the finding of the Special Master that adequate individual counseling occurs in the Correction Center and that the Defendants are in substantial compliance with this part of Rule 18. Further, the Special Master finds that the drug and alcohol rehabilitation counseling programs at the Center satisfy the requirements of this rule regarding group counseling, and therefore, the Defendants are also in substantial compliance with this requirement.

## RULE 19 EDUCATION

At the time of the First Report of the Special Master, the Correction Center had contracted with the Toledo Board of Education to provide educational services to the Center. It was planned that this would be for General Educational Development (G.E.D.) classes; two Adult Basic Education (A.B.E.) classes; as well as vocational training in food service and building maintenance.

Some of the problems with the educational programs in the Center as determined by the former Special Master included the conversion of classrooms into office space and living quarters; failure to inform inmates of the availability of such programs, and the unwillingness of the Center to allow inmates from different floors to attend the same class as well as to hold co-educational classes.

At the present time, the Correction Center contracts with the teachers directly rather than with the Board of Education. The Toledo School System, however, still supplies the workbooks and other materials for the teacher. Three teachers are pres-

ently under contract with the Center. Each teacher works two nights a week for three hours. The education schedule at the present time is as follows:

| FLOOR | DAY | TIME | TYPE OF CLASS |
|-------|-----|------|---------------|
| 3 | M & W | 6 to 9 | G.E.D./A.B.E. |
| 4 | M & T | 6 to 9 | G.E.D./A.B.E. |
| 5–6 | T & W | 6 to 9 | G.E.D./A.B.E. |

The teachers have attempted to revise somewhat the G.E.D. program to make it more suitable for the Correction Center, where the average length of confinement for an inmate is considerably shorter than it might be in prison. The teacher attempts to teach one segment of the G.E.D. program at a time and to do it in a shorter period of time than is normally required. The goal is to have inmates, who will not be confined long enough to complete the program, at least complete one or two parts of it. If they can see progress in this regard, the motivation to complete the entire program after leaving the facility may exist.

Inmates are now advised of the educational program by their assigned counselor during the initial interview.[53] Only inmates who have not received high school diplomas are eligible. If an inmate is interested, he fills out an application which is processed by the Inmate Services Department. The inmate is then placed into one of the three groups mentioned above. The classes are held in the multipurpose rooms on the designated floors and the mixing of the floors is now allowed.[54] Each class consists of approximately fifteen people. If an inmate qualifies to take the G.E.D. examination, he is transported to the Toledo Counseling and Testing Center where the examination is administered. A number of inmates have received their G.E.D. diplomas while incarcerated at the Lucas County Correction Center.

The Adult Basic Education classes are conducted at the same time as the G.E.D. classes. Inmates who are deficient in remedial reading, writing, and arithmetic are

given basic instructions by the teacher so that they may eventually qualify for G.E.D. participation.[55]

No vocational instruction is offered at the Correction Center.

## FINDINGS RELATING TO COMPLIANCE

The Special Master finds that the Defendants are in substantial compliance with Rule 19 in that both basic and remedial education programs exist in the Correction Center. This program includes both G.E.D. and A.B.E. classes.

## RULE 20 RECREATION

The Special Master, in his First Report, found the Defendants to be in noncompliance with the Court's provisions concerning recreation. This finding resulted from the fact that at that time, inmates were receiving only two hours of recreation per week and further, both hours were indoors. Until very recently, this situation regarding recreation continued to exist in the Correction Center.

At the time the new Correction Center was designed, it was anticipated that outdoor recreation would occur in two places. The outdoor recreation area located at the basement level was one. This area is basically an open-aired concrete pit which is relatively small given the number of inmates who use it. Also, this area is designed in such a way that very little activity, other than the playing of basketball or volleyball can take place. It was also anticipated that outdoor recreation would take place in the "exercise decks" which adjoin each module. At the time the Special Master wrote his First Report, the Sheriff indicated that these decks could not be used without a heavy duty screened perimeter being added to them to protect against escape attempts or the passing of contraband.

**53.** This information is also presented in the Inmate Handbook.

**54.** Classes are also now co-educational.

**55.** An individual must perform at approximately the eighth grade level in English usage and fifth grade level in math to qualify for G.E.D. participation.

The heavy duty perimeters were added to each exercise deck in early 1979. However, even with the added security, the Sheriff was reluctant to use the decks because of the severe surveillance problems that they caused. The only way of actually observing inmates' activity in these areas is to post a guard inside the deck, and the staffing level was inadequate to allow this. The Sheriff thus requested that these decks not be used at all. And, since both the Plaintiffs and the Special Master concurred that the decks were grossly ill-suited for any type of recreation other than perhaps weight-lifting, they agreed that the decks should not be used. As a result, after spending the funds to have the deck built and the spending of additional funds to construct the security perimeter, it was decreed, and Rule 21(c) requires that the decks not be used. A great deal of wasted space, and thus money, is therefore present in the Correction Center.

The outdoor recreation area posed security problems of its own. The Plaintiffs, in June of 1979, brought a motion for an Order to Show Cause [56] as to why the Defendants should not be held in contempt for failure to provide outdoor recreation. The Sheriff responded that the outdoor area was not secure. It was agreed, however, that this problem could, and would, be remedied. It was decided that a closed circuit television camera would be installed as well as a sound system allowing conversation with a control booth located in the basement. And, while this installation took an inordinate amount of time, it was finally completed, and some very limited outdoor recreation did take place in 1979.[57]

In addition to the difficulties concerning outdoor recreation, other problems with the recreation program generally have been encountered. First and foremost among these is that, until very recently, inmates were still being limited to two hours per week,[58] a totally unacceptable level. In addition, recreation was frequently cancelled because of elevator problems or because no staff members were available to transport the inmates to recreation. This latter problem was especially true with respect to women and trusties. A woman officer must accompany the women to and from recreation. Thus, the recreation officers, both male, could not transport the women alone as they could the male inmates. The times a women officer was not available to assist the recreation officer are far too numerous to mention. The same is true with respect to trusties who recreate at night. The recreation officers, who work first shift, were not available to transport the trusties, and very often, there was no counselor or other staff member either able or willing to take the trusties to recreation.

With the adoption of this Rule by the Common Pleas Court, which calls for at least four (4) hours of recreation per week for each inmate, a new recreation schedule was adopted. This new schedule is as follows:

| | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY |
|---|---|---|---|---|---|
| 8:30 – 9:30 a.m. | 3NE/3NW 3E | 2MED/4E 4W/5W | 3NE/3NW 3E | 6NA/6NB 6W | 3SE/3W 3SW |
| 9:30 – 10:30 a.m. | 6SA/6SB | 5SE/5SW | 2MED/4E 4W/5W | 6NC/6ND | 4NE/4NW |

---

**56.** This motion is still pending on the Court's docket.

**57.** Only women and trusties were permitted to go outside.

**58.** The recreation schedule was revised in February of 1980. The schedule indicated: "The Recreation Officers are empowered to deviate from this schedule and to take more than the scheduled modules for longer periods of time if they can do so safely." The result of this directive was that some inmates received as much as four (4) hours and twenty (20) minutes of recreation per week, while others received as little as one (1) hour and forty (40) minutes.

| | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY |
|--------------|----------------|---------------|---------------|-----------------|----------------|
| 10:30 – 11:30 a.m. | 6SC/6SD 6E | 5NE/5NW | 4NE/4NW | 5SE/5SW | 4SE/4SW |
| 12:30 – 1:30 p.m. | 5SE/5SW | 4NE/4NW | 3SE/3W 3SW | 5NE/5NW | 3NE/3NW 3E |
| 1:30 – 2:30 p.m. | 5NE/5NW | 4SE/4SW | 6SA/6SB | 4SE/4SW | 6SA/6SB |
| 2:30 – 3:30 p.m. | 3SE/3W 3SW | 6NA/6NB 6W | 6SC/6SD 6E | 2MED/4E 4W/5W | 6SC/6SD 6E |
| 5:00 – 6:00 p.m. | 6NA/6NB 6W | 3SE/3W 3SW | 5SE/5SW | 6SA/6SB | 6NA/6NB 6W |
| 6:00 – 7:00 p.m. | 6NC/6ND | 3NE/3NW 3E | 4SE/4SW | 6SC/6SD 6E | 6NC/6ND |
| 7:00 – 8:00 p.m. | 2MED/4E 4W/5W | 6NC/6ND | 6NA/6NB 6W | 3SE/3SW | 2MED/4E 4W/5W |
| 8:00 – 9:00 p.m. | 5E (T) | 5E (T) | 6NC/6ND | 5E (T) | 5E (T) |
| 9:00 – 10:00 p.m. | 4NE/4NW | 6SA/6SB | 5NE/5NW | 3NE/3NW 3E | 5SE/5SW |
| 10:00 – 11:00 p.m. | 4SE/4SW | 6SC/6SD 6E | 5E (T) | 4NE/4NW | 5NE/5NW |

As is readily apparent from this schedule, all inmates are now scheduled to receive five (5) hours of recreation per week. Also, it is now the procedure of the Center Administrator to conduct all recreation outdoors, weather permitting. An additional recreation officer was hired for the second shift because of the additional recreation time.

In a conference with the recreation officer following the introduction of this new schedule, the Special Master determined that the new program is working well. Inmates are, in fact receiving five (5) hours of recreation per week and, weather permitting, the recreation is occurring outdoors. This, initially, caused some inmates to complain since there were less activities available. However, according to the recreation officer, these complaints have subsided and the inmates now look forward to going outside.

This Special Master is also satisfied that only those inmates classified maximum security who pose a serious security risk, are not being allowed outdoors. This decision is being made by the Classification Team, and each case is decided individually.

## FINDINGS RELATING TO COMPLIANCE

The Special Master finds that the Defendants are now in substantial compliance with Rule 20. However, it must be noted that this is a very recent occurrence. For most of the tenure of the present Special Master, there has been non-compliance with the recreation provision. Close monitoring of the recreation program should continue to ensure continued compliance.

## RULE 21 RELIGIOUS SERVICES

■ In the First Report of the Special Master, three problems concerning religious services in the Center were discussed. The most basic problem was the exclusion of non-trinitarian clergymen from the Center. This resulted from the delegation by the Sheriff of the responsibility for religious services to the Jail Chaplaincy Committee. It was their duty at the time to approve or "clear" clergymen for entry into the jail. Since the Jail Chaplaincy Committee consists entirely of trinitarian clergy, they were not able or willing to certify clergymen from other religious sects or denominations. The former Special Master also found that no services were being conducted on the second floor, and finally, that Sunday services, throughout the facility, were not conducted on a regular basis.

The problems just discussed have, at the present time, all been corrected. The responsibility for religious services to inmates now rests with the Office of Inmate Services. Clergymen, regardless of denomination, are now admitted into the facility provided they can satisfy the requirements of Rule 21(b). No complaints have been received from non-trinitarian clergy that they have not been able to gain access to the facility, nor have any inmates of non-trinitarian denominations complained of being unable to see their clergymen.

The program of Sunday worship[59] has also greatly improved. In March of 1978, the Jail Chaplaincy Committee, which conducts the Sunday services, decided that performance of these services would be greatly facilitated by assigning a specific clergyman to each floor of the Center. This assigned clergyman now conducts two sixty minute services on his floor each Sunday. This has eliminated the logistical problem of requiring either the inmates or the clergy to travel from one floor to another to attend services.[60]

A member of this committee is also assigned to the second floor, and one service is conducted on this floor every Sunday.

Bibles and crosses are available to the clergy and are distributed to those inmates requesting them during the Sunday service.

In addition to the regular program of Sunday worship, the Jail Chaplaincy Committee also conducts weekly Bible classes on floors three through six. Again, a member of the committee is assigned a specific floor and conducts the Bible class, one day per week.

Clergymen of all denominations, provided they have been cleared by Inmate Services, are permitted into the Center at any time, except during the serving of meals, for the purpose of providing individual spiritual counseling. All that is required is that the clergymen want to see a specific inmate or have been requested by a specific inmate. Clergy are not permitted to roam from module to module or floor to floor in order to provide spiritual counseling.

## FINDINGS RELATING TO COMPLIANCE

It is the finding of the Special Master that the Defendants are in substantial compliance with Rule 21. A regular program of Sunday worship is maintained. Group and individual spiritual counseling is allowed, and clergy of any denomination are

---

**59.** Saturday Islamic services are also held from time to time.

**60.** Recently, because of an increased number of women housed on the third floor, men housed on three have had to travel to the fourth floor to attend services. This has caused some difficulties. Some men have decided not to attend if they have to travel to another floor.

permitted access to the facility once they have been cleared by Inmate Services.

## RULE 22 VISITING PROGRAMS

 At the time of the Special Master's First Report, only non-contact visitation was allowed. The visitation took place on each floor in specially designated visiting areas where the inmates and visitors viewed each other through a small viewing window and voice contact was made through a mesh screen. The Special Master found the visiting program to be totally unacceptable due to inadequate facilities as well as because of insufficient length and frequency of visits.

As a result of the above findings, the Special Master held a formal hearing on contact visitation in November of 1977, and in August of 1978, the Court issued an Order requiring the Defendants to implement a program of contact visitation within ninety (90) days from the date of the Court's Order.[61] As indicated in the introduction to this Report, the change in Special Masters occurred just prior to the expiration of the ninety (90) day period, and one of the present Master's first functions was to oversee the implementation of the contact visitation program.

While the Sheriff initially was not happy with the Court's Order concerning contact visitation (a notice of appeal was filed), eventually the differences between the parties were resolved, and in January of 1979, a stipulation concerning contact visitation was filed. It is this stipulation, with some modification, which constitutes the provisions of Rule 22.

Inmates, not classified to Sentence Maximum, Pre-Trial Maximum, or to Administrative Isolation,[62] are entitled to three, one hour contact visits per week, though not more than one per day. The visitation schedule is as follows:

| DAY | TIMES | FLOOR SCHEDULED FOR VISIT |
|---|---|---|
| Monday | 5:00 p.m. - 10:40 p.m. | All Floors |
| Tuesday | 12:00 noon - 3:20 p.m. | All Floors |
| Wednesday | 5:00 p.m. - 10:40 p.m. | All Floors |
| Thursday | 5:00 p.m. - 10:40 p.m. | All Floors |
| Friday | 12:00 noon - 3:20 p.m. | All Floors |
| | 5:00 p.m. - 10:40 p.m. | All Floors |
| Saturday | 12:00 noon - 3:20 p.m. | All Floors |
| | 5:00 p.m. - 10:40 p.m. | All Floors |
| Sunday | 12:00 noon - 3:20 p.m. | All Floors |
| | 5:00 p.m. - 10:40 p.m. | All Floors |

61. The Court Order was dated August 29, 1978.

62. Inmates classified to Administrative Isolation may be entitled to contact visits since the privileges of these inmates are restricted only as necessary to protect the inmate or others. Provisions also exist in the Policy and Procedure Manual of the Correction Center for inmates classified Maximum Security to receive contact visits.

On the following holidays, the Sunday Visitation Schedule will be in effect:

> Christmas Day
> New Year's Day
> Thanksgiving Day
> Memorial Day
> Fourth of July
> Labor Day

All holiday contact visitations shall be a maximum of 25 minutes in length and will not count as one of the inmate's 3 allocated weekly visitations.

All contact visitation takes place on the second floor in the library. Eight separate tables are arranged to allow adequate privacy (only one inmate has visitation at each table). Inmates and their visitors are allowed to embrace before and after the visiting session. A visitation session lasts a maximum of one hour, although a visitor may request a shorter visit of twenty-five (25) minutes.

Contact visitation has proven to be far more successful than many people had thought possible. It has proven effective in reducing the tension level of the inmate. According to the Casework Supervisor, it is the privilege inmates most fear having restricted. Thus, the threat of having it restricted has helped to positively modify some inmates' behavior.

According to the Visitation Counselor, the program has been successful for two reasons. One is that much time and planning was invested before the program was implemented. A number of other correction facilities, which had existing contact visitation programs, were visited. One example of good planning is the decision to hold visitation in the library rather than in the lobby area of each floor. The library is a far more comfortable setting in which to hold visitation. The acoustics are good, and

the problem of personnel (inmates and guards) not engaged in visitation having to travel through the visiting area is non-existent.

The other reason the program has proven successful is that it is secure. All inmates are strip searched before and after each visit. All visitors are required to pass through a metal detector and are subject to a pat-down or strip search.[63] As indicated above, before and after the visit, the inmates and visitors may embrace. However, during the visits, everyone's hands must remain above the tables. Three (3) staff members, two (2) men and one (1) woman, are present in the library during the visits. While some drugs have been found on inmates after visitation, these instances have been very few. No weapons have entered the facility as a result of the visitation program.

A review of the statistics on the visitation program indicates that far more people visit during the weekdays than on weekends and substantially more visit at night than during the day. Thus, the heaviest visiting periods are Monday, Wednesday, and Thursday evening (there is no Tuesday evening visitation) with an average of approximately thirty-six (36) visitors per night. Since on these evenings, there are forty (40) available visitation periods, one can see that visitation at these times is near capacity. To better balance the number of visitations at each of the various sessions, as well as to reduce the problem of unaccompanied children roaming the lobby area on the first floor,[64] children under the age of twelve (12) are permitted to visit only during afternoon or weekend sessions. Thus, children are not permitted at the three (3) heaviest sessions mentioned above.

---

63. The Visitation Counselor indicated that a problem existed when the program first started with visitors being arbitrarily strip searched without apparent or real justification. This problem was brought to the attention of the Center Administrator and has been rectified. Since very early in the program, no complaints concerning the strip searching of visitors have been received.

64. According to the Visitation Counselor, the major problem concerning children is that parents bring more than one with them to the Center. Since only one can visit at a time, the others remain in the lobby unattended. There is also the problem of controlling children during the time one must wait before visiting.

The visitation program has not been without its problems. There is a definite logistical problem in getting both the inmates and the visitors to the library after all of the necessary searches in a timely manner. Part of the problem in this regard is caused by the fact that there is only one female staff member working visitation. Given the fact that the majority of the visitors are female, it is simply not possible for this one person to transport both the female visitors and inmates, conduct all of the searches, and get everyone to the library on time. There are two (2) male officers who work visitation and the problem is much less severe with the men than with the women. The Special Master's monitoring of contact visitation indicates that the program often runs about ten (10) minutes late, and as a result, some visits are not of the full duration. At times, however, the sessions are extended to ensure the full visit.

Another problem is the extended waiting period for visitors before they actually get to visit. The problem is especially acute at the beginning of the program. Since there are only eight (8) slots available, the first eight (8) people to arrive at the Center visit first. Thus, visitors often arrive some two or two and one-half hours before the first visiting session. This wait is bad enough, but the ninth person may also arrive two hours early and he or she will have to then wait until the second session, which makes his or her wait approximately three hours. This latter problem has been somewhat solved by allowing visitors for the second and subsequent sessions to sign-up for visitation and then leave the Center provided they return approximately fifteen (15) minutes before their scheduled visit. If they are late in returning, they lose their slot.

Occasionally, contact visitation has been cancelled. This is usually the result of a mechanical failure: either the elevator is malfunctioning or there is some other power problem in the facility. There was one occasion, however, where visitation was cancelled because of a lack of sufficient staff to man it.

With regard to with whom an inmate may visit, generally there are no restrictions. Each inmate has an approved visitors list on which he may name anyone he wishes. The only requirement is that he give the visitor's first and last name and also his relationship to the visitor (e. g., relative, friend.) Attorneys and clergymen need not be on the list. Only if the visitor has been previously in the Correction Center and posed a significant disciplinary problem or if he or she has been found to be smuggling contraband into the facility will the visitor be banned. It should also be noted that although Rule 22(d)(5)(c) indicates that an inmate will be allowed to visit with his co-defendant unless it is apparent that the two inmates are aggressive toward each other or if the trial judge has restricted their contact; in fact, these visits do not occur. Co-defendants are kept separate throughout all aspects of Center programming.

Non-contact visitation continues to occur for those inmates whose classification does not permit contact visits. These non-contact visits usually take place on the sixth floor. Since there are relatively few inmates in this situation, the congestion noted by the former Special Master no longer exists. Also, a new phone system has been installed which greatly improves the communication between the inmate and the visitor.

Finally, the Sheriff has established an appropriate set of rules and procedures for visitors pursuant to Rule 22(i).[65]

## FINDINGS RELATING TO COMPLIANCE

It is the finding of the Special Master that the Defendants are in substantial compliance with Rule 22. The program of both contact and non-contact visitation has been

---

**65.** These Rules are attached as Appendix 12.*
 * Available copy of Appendix 12 is illegible, and hence not reproduced.

established and maintained. Inmates are receiving up to three, one hour visits per week, and have the opportunity to visit both in the afternoon and evening. Visitation is also available on Saturday and Sunday, and special visits are provided on the designated holidays. Further, except for co-defendants, inmates are able to visit with those individuals whom they list on their approved visitors list. The Special Master finds that visitors on their list are not being restricted from visitation without just cause.

### RULE 23 CLEANLINESS OF CENTER

■■ The former Special Master found in his First Report that there was no organized and supervised program of daily cleaning in the Correction Center. It was found that cleaning supplies were not provided on a regular basis nor were they available, when supplied, for a sufficient period of time to allow proper cleaning. Finally, it was determined that regular daily inspections were not being conducted.

At the time the present Special Master assumed his responsibilities, the sanitary conditions in the Correction Center had not remarkably changed from the time of the First Report. An initial inspection of the Center for cleanliness by the present Special Master found it to be, on the whole, dirty and unsanitary. Food particles were on the floor, the food slots and elevators were dirty, the cells were unkempt, and it was generally evident that cleaning on a regular basis was not taking place.

The above findings were, of course, brought to the attention of the Defendants, who responded by commencing a more organized program of cleaning. The most important change made by the Defendants was the introduction of floor supervisors for each floor. The rank of corporal was established, and a corporal was then placed in charge of each floor. It became this officer's responsibility to see that his or her floor, including all cells and modules, were kept clean. The corporal also has the obligation of conducting an inspection of the floor each morning.

This program of floor supervisors was commenced in March of 1979, and its effect on the cleanliness of the facility was noticable almost immediately. The floor lobby areas and the module dayrooms were regularly cleaned and inspected. Materials for cleaning were supplied on a daily basis and were left in the module for a sufficient period of time to allow proper cleaning.

The fact that the floor supervisors program improved the sanitary conditions in the Center, however, does not mean that problem areas no longer exist. In a series of letters to the Defendants beginning in January of 1980, the Special Master indicated the areas which need improvement. These letters reflect that the landing areas, service areas, and the service elevator, itself, were dirty and in need of cleaning. Also, the individual cells in booking were extremely dirty. These areas did improve following the receipt of these letters.

In addition, this series of letters reflected that the pre-trial trusty module, 5NE, as well as the modules on the sixth floor were not being regularly cleaned. In response, one floor supervisor took the approach of charging every inmate in a sixth floor module with a disciplinary violation for failure to clean his module and cell. This is a completely appropriate response since the cooperation of the inmates is essential to maintaining the sanitation of the Center. The cleanliness of these modules also subsequently improved.

The one area of the Center which is not yet satisfactory is the lavatory areas, including the sinks, showers, and toilets, in each module. This is partially caused by the fact that the showers do not work properly and direct water into the lavatory area. This makes cleaning much more difficult. It is also clear, however, that not as much effort is spent cleaning these areas.

As was mentioned in the report on Rule 11, an extensive project is underway in the Center, the purpose of which is to thoroughly clean and sanitize all living areas. Inmates are moved out of their module for an entire week, during which time all modules

and cells, including walls, ceiling, floor, and bars, are thoroughly cleaned and disinfected. In addition, the lavatory is completely scrubbed down, the showers are repaired, and the shower stall is painted. The only floor on which the project has been completed is six [66] and the improvement is noticable. It is now up to the floor supervisor, as well as the inmates to maintain the level of cleanliness achieved through this effort.

In addition to the showers, additional painting is needed outside of the visitors elevator on several of the floors. Repainting has been completed in the first floor lobby area, as well as in parts of the kitchen.

## FINDINGS RELATING TO COMPLIANCE

The Special Master finds that the Defendants are in substantial compliance with that part of Rule 23(a) which requires an organized and supervised program of daily cleaning. Mopping and scrubbing, though not wall washing, do take place regularly. Inmates do make their own beds and clean their own cells, and inspections are held each morning.

The Special Master further finds that the Defendants are not in compliance with Rule 23(b) in that all sinks, toilets, and showers are not washed and cleaned on a daily basis.

The Defendants are in substantial compliance with Rule 23(c), (d), and (e) in that appropriate supplies are provided, the living areas are not littered, and the bars are kept clean.

There is, however, substantial non-compliance with Rule 23(f) in that certain areas of the Center, especially the showers, are in need of painting.

## RULE 24 CLEANLINESS OF PRISONERS

 The First Report of the Special Master determined that there was no regular program for the dispensing of soap, tooth brushes, and toothpaste. It was also found that clean linen and uniforms were not exchanged on a regular basis or with sufficient frequency.

The problem of distributing clean linens and uniforms on a regular basis continued for some time after the present Special Master assumed his duties. For example, in May of 1979, a review of the linen and uniform exchange revealed that only the trusties on the fifth floor had received clean linen and uniforms with sufficient frequency. On the third floor, it had been three weeks since the last exchange. On the fourth floor, it had been two weeks, and on the fifth floor, it had been three weeks since clean uniforms and linen were distributed.

The problem continued for some months after this inspection. The difficulty arose from the fact that laundry has to be sent out of the facility (there being no in-house facilities), and it was not being returned in sufficient time to allow weekly exchanges. In addition, there was not a sufficient inventory of linens and uniforms to allow an exchange without the receipt of the laundered goods. Finally, no one individual was charged with the responsibility of ensuring that laundry was exchanged.

In the Fall of 1979, additional supplies of both uniforms and linen were ordered and received. In addition, a linen/property officer was put in charge of the linen and uniform exchange. With these two changes, the linen and uniform exchange became more frequent and regular. Numerous inspections by the Special Master and his assistants since that time have revealed that each week an inmate is given a clean sheet, towel, washcloth, and uniform.

With regard to other articles of clothing, i. e., underwear and socks, the inmates launder these themselves in their modules. Buckets and detergent are provided by the officers and sufficient hot water is available. However, since these articles are put on newspapers on the floor to dry, it is not the most sanitary way of doing laundry.

---

**66.** Work has commenced on the fourth floor. However, if the population of the Center is too high, inmates can not be moved, thus causing delay in the completion of the project. The project was started in April and less than two floors are finished.

The Defendants have agreed to install in-house laundry facilities. In fact, it was thought that these facilities would be installed by the time of the writing of this report. However, difficulty in obtaining proper specifications in addition to the fact that physical alteration to the Correction Center is required, has delayed the installation. As impossible as it may seem, no venting system for dryers was installed in the facility though there is an area designated for in-house laundry facilities. Thus, this venting system must now be installed.

This laundry facility, in addition to saving the County money, will certainly increase the ability of the Center to frequently exchange laundry, and will also provide a far more efficient way to launder the articles of clothing now being washed by hand.

Before an inmate is permitted to enter the general population, he is required to bathe. Soap and towels are provided by the County as needed. Also, at that time, the inmate is provided with a clean blanket, sheet, washcloth, towel, and uniform. Not all inmates, however, are provided with pillows and pillowcases.

Until the adoption of the rules, bedding, i. e., mattress and pillows, were not removed and sanitized when an inmate left the Center. However, the present policy now is to remove all bedding and sanitize it before issuing it to a new inmate.

Soap is readily provided to all inmates for bathing. Non-indigent inmates, who do not have a toothbrush or toothpaste, may purchase them through the commissary. Indigent inmates are provided these articles by the County.[67] No complaints have been received that inmates were unable to obtain either soap, toothbrushes, or toothpaste. In addition, razors are provided each morning to enable inmates to shave.

### FINDINGS RELATING TO COMPLIANCE

It is the finding of the Special Master that the Defendants are in substantial compliance with Rule 24(a) in that all inmates

are required to bathe upon entering the Center and that bathing facilities are available on a daily basis. Soap and towels are also available.

With respect to Rule 23(b), the Special Master finds that clean blankets, sheets, washclothes, and towels are issued to each new inmate. However, not all inmates have pillows and pillowcases, and to this extent, the Defendants are not in compliance. Also, freshly cleaned towels, sheets, and washcloths are provided weekly.

The Defendants are in substantial compliance with Rule 24(d) in that bedding is now cleaned and sanitized before and after it is issued to an inmate. The Special Master also finds that the bedding of the inmates is kept free from vermin and filth.

The Defendants are also in substantial compliance with Rule 24(d) and (f) concerning the cleaning and exchange of uniforms. However, the Special Master notes that the facilities for cleaning undergarments and socks is not satisfactory, but should be corrected by the installation of in-house laundry facilities.

There is also substantial compliance with Rule 24(e) in that razors, toothbrushes, and toothpaste are available.

Finally, the Defendants are in substantial compliance with Rule 24(g) concerning bedding except to the extent that not all inmates have pillows.

### RULE 25 EMPLOYMENT AND TEMPERANCE

 There has been established in the Lucas County Correction Center an in-Center work program whereby certain trusted inmates perform various functions. These inmates, known as trusties, perform one of two roles: floor trusties or service trusties.

Floor trusties are normally pre-trial inmates who are considered medium security risks. They are permitted to work only on floors two through six usually performing functions of a janitorial nature.

---

**67.** The actual practice is that most inmates obtain these articles from the dentist.

Service trusties are considered minimum security risks and are thus permitted to work in areas of the Center such as booking, the kitchen, and Main Control.

Guidelines have been established for the selection of trusties. Service trusties must apply for such a position through their assigned counselor. Floor trusties must first be recommended by a Floor Supervisor and then they may apply through their assigned counselor. In either case, the assigned counselor makes an evaluation and recommendation. The applications and evaluations are then submitted to the Classification Team which makes the final decision.

Trusty status is voluntary, and the inmates receive no monetary compensation. They do enjoy certain privileges as a result of their status, most notably a reduction in the amount of time they must serve (good time).

Alcoholic beverages of any kind are prohibited in the Correction Center as are narcotics other than those prescribed by the Center physicians. Both alcohol and narcotics are considered contraband, and possession or use by an inmate subjects him to disciplinary action.

### FINDINGS RELATING TO COMPLIANCE

The Defendants are in substantial compliance with Rule 25. An in-house work program, using trusted inmates, has been established with suitable guidelines governing the choice of such inmates. Also, both alcoholic beverages and narcotics are prohibited in the Center. Finally, trusties are not given monetary compensation.

### RULE 26 DISCIPLINARY PROCEDURES

■ The First Report of the Special Master considered the disciplinary procedures which were in effect as a result of a Stipulation and Order entered on November 1, 1972. Since the former Master found some difficulties with this procedure, he began efforts to institute a new disciplinary

procedure. This was accomplished with the filing of a Stipulation and Order dated July 31, 1978 which required the Defendants to implement the new disciplinary system no later than August 25, 1978.

The new system[68] has been in effect since August of 1978, and, for the most part, has proven to be fair and effective.

There have been cases where the wrong charges were levied against an inmate or where the disciplinary board failed to decide certain charges. These matters were brought to the attention of the Defendants and greater care was then taken in the filing, preparing, and dispositions of these offenses.

There have also been several cases where the punishment given the inmate was not authorized by the disciplinary procedures. As with the above cases, however, these appear to be isolated, and not intentional, violations.

The major problem initially with the disciplinary system was the failure to consistently have three (3) members sitting on the board. The procedures allow for two members of the Center Administration and one member of the Jail Chaplaincy Committee to sit on the board. However, the rules also provide that only two members are required in order for the board to conduct a hearing. Substantial difficulties were encountered in getting members of the Chaplaincy Committee to sit on the board and also in drafting a schedule which would permit their presence. In 1979, for example, there were eighty-six (86) disciplinary board hearings, only fifteen (15) of which were attended by all three members of the board.

Finally, enough Chaplaincy Committee members volunteered for the board, and a fixed schedule (Monday, Wednesday, and Friday at 3:00 p. m.) was arrived at so as to greatly alleviate the problem. It is important both from the standpoint of the inmates' perception of the hearing as well as the conduct of the hearing itself to have three member boards sit.

Statistics concerning the activities of the disciplinary board during 1979 were com-

---

**68.** All of the provisions of the Court Order of July 31, 1978 have been included in Rule 26.

piled by the Administrative Assistant who sits as a member of the board. These indicate that of the 455 Class I offenses charged during the year, 367 resulted in findings of guilty, while 188 resulted in findings of not guilty. Of the Class II charges, there were 101 findings of guilty and 23 of not guilty.[69]

The statistics also indicate a reduction in the use of isolation as punishment. Whereas the former Master found isolation, and not restriction of privileges, to be the most common source of punishment, this no longer appears to be the case. Isolation may not be used as punishment for a Class II offense. Of the 368 findings of guilt to Class I offenses in 1979, isolation was handed down in 128 cases. Considering all cases, warnings were issued more frequently than any other discipline with isolation next and then restrictions of privileges. Work details were used least frequently.

With regard to the actual conduct of the hearing, no evidence has been presented that the time limits for holding a hearing[70] have been violated. Further, inmates have received copies of the charges, been allowed to be present at the hearing, make statements, and can call witnesses. They are also allowed to confront their accusers. The findings of the disciplinary board and the evidence relied upon are put in writing, and the inmate is given a copy of these findings. While initially there were some problems with notifying the inmates of their right to appeal, this appears to have been rectified. The inmate has the right to appeal to the Corrections Administrator who reviews the decision but does not hold a new hearing. He may affirm or reverse the decision and also may reduce the punishment.

### FINDINGS RELATING TO COMPLIANCE

It is the finding of the Special Master that the Defendants are in substantial compliance with Rule 26 in that the disciplinary procedures as outlined in the Rule are being followed.

### RULE 27 BIBLES AND RELIGIOUS ARTICLES

■ As was mentioned in the Report on Rule 21, Bibles are available in the Center and are passed out to inmates who so request them at Sunday worship services. There also have been no indications of censorship of other religious papers, magazines, or books.

### FINDINGS RELATING TO COMPLIANCE

The Special Master finds that the Defendants are in substantial compliance with Rule 27.

### RULE 28 INMATE PROPERTY AND COMMISSARY

■ When an inmate is booked into the Lucas County Correction Center, any money or other personal effects he has on him are confiscated. Any money on the person of a prisoner at booking is then sealed in an envelope and placed in a lock-box in booking. The envelope will have a number corresponding to the inmates' respective booking sheet. The amount of money is marked on the envelope and on the booking sheet for that inmate.

Other personal effects on the inmate such as watches, rings, bracelets, or billfolds are also taken and placed in an envelope. The items are recorded individually on the outside of the envelope. A bin number is then given to the inmate, and this number is recorded on the booking sheet and on the envelope. This property is then stored in the property bin.

If an inmate is classified into the general population of the Center, there are certain

---

**69.** These statistics have been verified by the records made available to the Special Master each week.

**70.** A Class I offense may not be brought on for hearing earlier than 24 hours after commission nor later than 5 days after commission. A Class II offense has only the 5 day restriction.

items of property which may be kept in the cell. All other property, e. g., street clothes, will be stored by the Center. Male inmates' property is stored in the inmate property room in the basement. Female inmates' property is stored on the third floor.

Those items which an inmate may keep in his or her cell are as follows:

*Approved Items—Male Inmates*:

3 sets of underwear

3 T shirts

3 pairs of socks

1 wedding band

1 religious medal with chain (small)

1 rosary beads

1 soft plastic comb

1 soft plastic pic

1 dictionary and education correspondence course textbook

1 pair plastic or rubber thongs or 1 pair slippers

1 pair athletic sneakers

1 quiet game (Monopoly, Chess, Checkers, etc.—must be in sealed package as provided by the manufacturer)

1 small, pocket-size transistor radio (battery operated only with ear piece)

2 batteries for transistor radio

Family photographs (no metal, glass or plastic frames allowed)

*Approved Items—Female Inmates*:

6 pair underpants

3 slips

3 bras

1 robe

1 pair pajamas

1 pair shoes, or plastic or rubber thongs or slippers or athletic sneakers

1 pair earrings (post type and modest only)

1 religious medal with chain

1 radio 3 × 6 or less (batteries only) (2 batteries for transistor radio)

2 family photographs (no metal, glass or plastic frames allowed)

In addition, the following items of property may be stored:

*Items to be kept in Inmate's Property Room—Male*:

1 pair of pants

1 shirt

1 belt

1 tie

1 coat, jacket or sweater

*Items to be kept in Inmate's Property Room—Female*:

1 pair shoes

1 dress or slacks and blouse

1 lipstick

1 wig or hairpiece

Each inmate has a property file card which lists these items. If an inmate needs these clothes to go to Court, the card will be pulled and referenced to the appropriate items. The card is then marked "out to Court" and the clothing is then sent to the floor. When an inmate returns, the clothes are left in bins in the floor linen stockroom and are removed by the second shift property officer.

Property may be delivered to any inmate on the first and third Tuesdays of the month from 9:00 a. m. to 11:00 a. m.; the second and fourth Tuesday of the month from 4:00 p. m. to 6:00 p. m., and if there is a fifth Tuesday, from 9:00 a. m. to 11:00 a. m.

An inmate may release property on the first and third Thursday of the month from 9:00 a. m. to 11:00 a. m.; the second and fourth Thursday from 4:00 p. m. to 6:00 p. m.; and again, if there is a fifth Thursday, from 9:00 a. m. to 11:00 a. m.

Commissary is also available to all inmates unless this privilege has been restricted by the Disciplinary Board.

Each floor has one commissary day per week. On the second shift of the day before, the Commissary list,[71] in triplicate, is

71. A sample list is attached as Appendix 13.

passed out to each inmate. This list gives the items and prices of the merchandise available through the commissary. The lists are filled out by the inmates and returned to the floor officer (the inmates keep one copy) who, in turn, forward them to Main Control. One copy then goes to the Commissary Clerk, who determines the amount of money being spent ($20.00 is the maximum) and ensures that the inmate has sufficient funds in his account to pay for the items. This clerk then makes the appropriate accounting entries.

The other copy of the list goes to the Commissary agent who fills the order, places the items in a bag which is then sealed, and a copy of the list is attached to the bag. During the first shift of the designated day for each floor, the commissary agent and an escort officer then deliver the goods to the inmates. The bags are opened in the inmate's presence so that any discrepancies can be resolved immediately.

Inmates who for one reason or another, e. g. at court, missed their designated Commissary day are able to exercise this privilege on Friday.

### FINDINGS RELATING TO COMPLIANCE

It is the finding of the Special Master that the Defendants are in substantial compliance with Rule 28. Property of the inmates are taken and secured by the Sheriff at the time of the inmate's entry into the facility. Further, additional items of property may be delivered to the inmate each week. Appropriate records of inmates' property are kept.

Also, the Defendants are in compliance with these Rules in that an appropriate Commissary system has been established. The inmate's money is credited to his or her account and each inmate is given the opportunity to purchase items, with this money through the commissary.

72. A copy of this report is attached as Appendix 14.*

### RULE 29 OTHER RULES TO PROMOTE THE WELFARE OF PRISONERS

There is in existence at the Lucas County Correction Center a fire escape plan which provides for the orderly evacuation of personnel from the facility in case of fire. In addition, Fire Inspection Officials do inspect the facility at least once a year. The last inspection was in October of 1979, and the Special Master has been informed that a similar inspection is scheduled for 1980, but has not as yet taken place.

With respect to health inspections, upon the inquiry by the Special Master in April of 1980, it was determined that the last inspection of the entire facility had been in September of 1978. Thus, while inspection of the food service operation occurs periodically (three times per year), there are not periodic health inspections of the entire Correction Center. Upon request of the Special Master, a complete inspection was conducted on May 14, 1980.[72] It should be noted that as of the writing of this report, some of the difficulties discovered by the Health Department have not been remedied.

### FINDINGS RELATING TO COMPLIANCE

The Special Master finds the Defendants to be in substantial compliance with Rule 29(a) in that an appropriate fire escape plan exists and regular fire inspections take place.

There is, however, substantial non-compliance with Rule 29(b) in that health inspections of the entire facility do not occur four times per year. Also, it should be noted that the repairs mandated by the health inspection reports are not completed in a timely fashion.

Finally, with regard to Rule 29(c), the Special Master finds that the Sheriff has charge of the jail and that specific rules and

* Available copy of Appendix 14 is illegible, and hence not reproduced.

regulations governing the day to day activities of the Center have been established. However, to the extent that findings on non-compliance have been found regarding other Rules, the Defendants are also in non-compliance with Rule 29(c).

## RULE 30 STAFFING

 The records of the Lucas County Correction Center reveal that members of the present staff have successfully completed the Bureau of Prisons course.

With respect to Rule 30(b) which requires the Sheriff to guard the inmates constantly in order to preserve and protect their security and safety, this Rule was included so that the Court of Common Pleas would be able to review the Sheriff's staffing levels to ensure their adequacy. The Federal Court has expressed the view that the area of staffing is one where the *Wolfish* decision has removed its authority.

Given the position of the Court, the Special Master believes the monitoring of the staffing levels should be a function of the Jail Monitor and the Court of Common Pleas. However, the Special Master feels compelled to reveal two areas where such monitoring should be extensive. First, it has been indicated on several occasions in this report that inmates did not receive a scheduled program, e. g., visitation or recreation, because there was inadequate staffing to man the programs. In the opinion of the Special Master, this is a totally inadequate excuse for the cancellation of the program.

Second, and more disturbingly, the occasions on which the Special Master has visited a floor of the Correction Center and found all of the Corrections Officers on duty on that floor in the control booth rather than at their assigned posts, are too numerous to recount. While the Supreme Court has restricted the Court's power in this area, the Court's December 17, 1976 opinion remains as true today as it was then:

> What the order of July 30, 1971, provided was that the prisoners were to be guarded constantly. The reason for this is that if they are not, the strong ones will prey upon the weak, the suicidal will kill themselves, and the seriously ill or disturbed will become worse.... The same risks to prisoners will be present in the new jail as are present in the old one unless the prisoners are constantly watched.[64]

[64] *Jones v. Wittenberg*, Order, December 17, 1976.

### FINDINGS RELATING TO COMPLIANCE

The Special Master finds the Defendants to be in substantial compliance with Rule 30(a) but makes no finding with respect to Rule 30(b).

## RULE 31 ASSAULTIVE BEHAVIOR

 This Rule resulted from the conviction of four Correction Officers in November of 1979. It is the procedure which was used with respect to those four individuals.

Since there have been no convictions of Correction Officers since that time, the procedures have not again been tested.

### FINDINGS RELATING TO COMPLIANCE

The Special Master finds the Defendants to be in substantial compliance with Rule 31.

Respectfully Submitted,

_____

Timothy J. Doyle
Special Master

## APPENDIX 2

### SHIFT COMMANDER'S INFORMATION SHEET

FIRST SHIFT
Shift Commander: _Pacheco_ Date _May 24_ 19 _79_

Head Counts: _297_ Male _266_ Female _31_ Total in LCCC _297_

Receiving: _54_ Male _52_ Female _2_

2nd Floor: _21_ Male Class. _5-m_ (_2-F_) Male Med. _11-m_ (_1-F_)

 Female Class. _2-f_ Female Med. _____

3rd Floor: _48_ Male _22_ Female _26_

4th Floor: _55_ Male _55_ Female _____

5th Floor: _61_ Male _61_ Female _____ one out to Wood County

6th Floor: _58_ Males (County) _____ Males (City Unclass.) _____

 Males (City Class.) _____

TOTAL NO. OF C/O's ON DUTY _28 = 28 reg + 0 recall_

---

SECOND SHIFT
Shift Commander: _Ashby_

Head Counts: _289_ Male _258_ Female _31_ Total in LCCC _289_

Receiving: _38_ Male _38_ Female _0_

2nd Floor: _23_ Male Class. _5-m_ (_4-F_) Male Med. _11-m_ (_1-F_)

 Female Class. _2-m_ Female Med. _____

3rd Floor: _49_ Male _23_ Female _26_

4th Floor: _57_ Male _57_ Female _____

5th Floor: _644_ Male _64 / 1_ Female _____ out to Wood County

6th Floor: _58_ Males (County) _____ Males (City Unclass.) _____

 Males (City Class.) _____

TOTAL NO. OF C/O's ON DUTY _27 = 27 reg + 0 recall_

---

THIRD SHIFT
Shift Commander: _Terrill_

Head Counts: _293_ Male _264_ Female _29_ Total in LCCC _293_

Receiving: _48_ Male _48_ Female _0_

2nd Floor: _24_ Male Class. _3-F_ (_2-m_) Male Med. _1-F_ (_1-m_)

 Female Class. _2-m_ Female Med. _____

3rd Floor: _48_ Male _23_ Female _25_

4th Floor: _54_ Male _54_ Female _____

5th Floor: _61_ Male _61_ Female _____ + 1 out to Wood County

6th Floor: _58_ Males (County) _____ Males (City Unclass.) _____

 Males (City Class.) _____

TOTAL NO. OF C/O's ON DUTY _19 = 19 reg + 0 recall_

APPENDIX 13

| Item | Price |
|---|---|
| COCOA BUTTER | .95 |
| HAIR PICKS | .79 |
| POCKET COMBS | .25 |
| BLACK & WHITE SOAP | .80 |
| INTENSIVE CARE LOTION | $1.20 |
| ROYAL CROWN ORIGINAL | .50 |
| SOAP (Ivory, Zest, Camay, Dial) | .35 |
| BODY POWDER | .75 |
| DEODORANT (Men) | .90 |
| MAGIC SHAVE | .80 |
| PRELL SHAMPOO | .90 |
| LUSTRA-SILK SHAMPOO | 1.10 |
| TOOTHPASTE (Crest, Gleam) | .50 |
| TOOTHBRUSH | .55 |
| DEODORANT (Ladies) | $1.30 |
| LUSTRA-SILK HAIR CONDITIONER | $1.35 |
| ARTRA SKIN CREAM | $2.00 |
| WRITING PADS | .60 |
| PENCIL .07 PEN | .25 |
| PLAYING CARDS | .60 |
| STAMPED ENVELOPE | .19 |
| 9 VOLT BATTERIES | .70 |
| 9 VOLT ALKALINE BATTERY | $1.60 |
| SIZE AA BATTERIES | 2 for .62 |
| SIZE AA ALKALINE BATTERY | 2 for $1.30 |
| LADIES TAMPONS | .85 |
| DICTIONARIES | $1.95 |
| LEGAL PADS | .69 |
| CORN CHIPS | .30 |
| PORK RINDS (Bar-B-Q) | .30 |
| CRUNCH CHEEZ DOODLES | .30 |
| POTATO CHIPS (Plain or Bar-B-Q) | .30 |
| TOTAL | |

**SUBSTITUTIONS WILL BE MADE IF NECESSARY**
**I HAVE RECEIVED THE ABOVE ARTICLES FOR THE AMOUNT SHOWN $** _____
**SIGNATURE** _____
**BALANCE IN YOUR ACCOUNT $** _____

## COMMISSARY LIST

CELL BLK_____ CELL_____ DATE _____

**THIS WILL BE YOUR AUTHORITY TO WITHDRAW FROM MY PERSONAL ACCOUNT THE AMOUNT OF**
$___ _____

SIGNED_____

**ALL CIGARETTES 65¢ a pack or $5.90 an unopened carton**

| Quantity | . | Amount |
|---|---|---|
| CAMEL (Reg.) | | |
| MARLBORO | | |
| KOOL or KOOL LONGS | | |
| PALL MALL (Reg.) | | |
| VICEROY | | |
| WINSTON (Reg. or Lights) | | |
| MORES (Reg. or Menthol) | | |
| SALEM (Reg. or Long) | | |
| CIGARETTE PAPERS .15 | | |
| | | |
| PIPE TOBACCO .50 | | |
| BUGLER TOBACCO .33 or 2 for .85 | | |
| CIGARS 2 for .25 or 2 for .35 or .09 ea. | | |
| MATCHES 2/.01 or .25 a box | | |
| | | |
| SALTED PEANUTS .25 | | |
| PEANUT CANDY BLOCK .25 | | |
| JELLY CANDY BAR .25 | | |
| LIFE SAVERS .25 | | |
| HEATH BAR .25 | | |
| PEPPERMINT PATTY .25 | | |
| REESE CUP .25 | | |
| BUTTERFINGERS .25 | | |
| 3 MUSKETEERS .25 | | |
| MILKY WAY .25 | | |
| SNICKERS .25 | | |
| VANILLA BUN .25 | | |
| MAPLE BUN .25 | | |
| BIT-O-HONEY .25 | | |
| COOKIES .25 a pack | | |
| CRACKERS (Cheese or Peanutbutter) .25 | | |